**Milford A. CAMPBELL, Plaintiff-Counter-Defendant Appellant,**

v.

**SPECTRUM AUTOMATION COMPANY, Defendant-Counter-Plaintiff Appellee.**

**No. 74–2157.**

United States Court of Appeals, Sixth Circuit.

April 17, 1975.

the patent to be invalid on a number of grounds. We affirm on one of these grounds—that Campbell was not the inventor of the patent in suit.

The patent discloses an article that is used in material handling as a flexible feed track. Briefly described, wire is wound in closely adjacent loops around a square or rectangular mandrel and then coated with a flexible covering such as polyvinyl chloride. It is necessary to machine a groove through the length of this assembly to remove the article from the mandrel. Besides serving the purpose of releasing the assembly from the mandrel, the groove provides a useful access to the interior of the feed track. The resulting product, known as "Open-Flex," consists of individual metal segments bound together by the flexible coating. This invention is described in claim 3 as follows:

> 3. A flexible feed track for delivering articles by gravity along an irregular path comprising a plurality of hollow formed, segmental frame members disposed side by side along the length of said track and joined together by a bonded flexible coating, said frame members and said coating defining a way for articles to be delivered by said track, each of said frame members having spring-like characteristics so as to alter the cross-section defined thereby when a force is applied thereto and return to its original shape when the force is removed so as to cooperate with the inherent flexibility of said coating to permit said track to be formed torsionally and arcuately as required to conduct said articles along a desired path of travel.

Charles W. Chandler, Livonia, Mich., for plaintiff-counter-defendant appellant.

Robert G. Mentag, Donnelly, Mentag & Harrington, Detroit, Mich., for defendant-counter-plaintiff appellee.

Before PHILLIPS, Chief Judge, and WEICK and MILLER, Circuit Judges.

PHILLIPS, Chief Judge.

Milford A. Campbell, the patentee of United States patent No. 3,002,600, brought this action against Spectrum Automation (Spectrum) for infringement. Spectrum counterclaimed, contending that the patent was invalid and that it therefore could not be infringed. District Judge Cornelia G. Kennedy held

The two principals in this action, Richard Zimmerman and Campbell, both possess a high degree of technical expertise in this area. Zimmerman, who is now president of Spectrum, originally worked for Campbell and Campbell Machines Company during the period when Open-Flex was conceived. Later he formed his own company, Spectrum, and began to produce the product "Maxi-Flex,"

which Campbell contends infringes the patent in suit.

■ The only issue which we reach on this appeal concerns the identity of the true inventor of the flexible feed track. In the counterclaim for declaratory judgment of invalidity Zimmerman alleged that he, not Campbell, was the true inventor of Open-Flex. If this is true, the patent would be invalid under the provisions of 35 U.S.C. § 102(f), which states that a "person shall be entitled to a patent unless . . . he did not himself invent the subject matter sought to be patented, . . . ."

The testimony in the District Court concerning inventorship is summarized in the following paragraphs. In early 1958 Campbell Machines Company received a purchase order for a number of storage feeders. Zimmerman was given the job of preparing the manufacturing information for the feeders and releasing the designs to the production shop. Although most of the feeder components were standard and had been produced previously, the lack of working space in the plant where the feeders were to be installed necessitated a new style of feed track.

Open-Flex was designed to fill this need. There is conflicting testimony as to the source of this idea and its reduction to practice. Campbell testified that confronted with this problem, he conceived the invention of Open-Flex just as it was later manufactured and patented, and that he gave full directions to Zimmerman as to how to manufacture it. These directions, he said, included the slot and were complete in all respects. Judge Kennedy found this testimony not to be credible and expressly stated that: "The Court does not believe Mr. Campbell's testimony."

Zimmerman's testimony included an express denial that he had ever been given such directions by Campbell. Zimmerman testified that he discussed with his father, who was an experienced and skilled tool and die maker, the problem of providing a flexible feed track to carry out the feeding function. Al-though the younger Zimmerman was also a tool and die maker, he did not know at that time that a spring could be wound in a rectangular shape. In the discussion with his father, Zimmerman reviewed hoses and tubes which use a spring wire spirally-wound body covered with a flexible coating, such as a vacuum hose. While with a previous employer Zimmerman had seen spirally-wound feed track or feed chutes. These were sometimes wrapped with electrical tape. Zimmerman's father was wearing a spring tension belt buckle at that time with a rectangular cross-section. From this belt buckle Zimmerman conceived the idea of a spirally-wound, rectangularly-shaped feed track, a flexible feed track with a rectangular cross-section. Zimmerman's father helped Zimmerman wind such a track which Zimmerman then showed to Campbell.

Judge Kennedy made a finding of fact that Zimmerman's testimony was a true statement of the events described, saying "The Court believes the testimony of Mr. Zimmerman."

The winding of the coil is only part of the invention. After the coil is wound it must be removed from the mandrel. Zimmerman's version, which also was corroborated by a coworker, was that "the slot was incorporated into the manufacturing process because of the inability to get the wound wire spring off the square mandrel." Judge Kennedy accepted this version and discredited Campbell's testimony that "the slot was a part of his original invention as he conceived it."

When the slot is created, the coherent spring is severed into as many segments as there are loops. To keep these from falling apart the flexible coating is applied prior to the slotting operation. Judge Kennedy credited the testimony that this process was conceived by Zimmerman, rather than by any action on the part of Campbell.

Neither party had strong supporting evidence to corroborate his oral testimony. Neither Campbell nor Zimmerman had notes, journals or other records of

their work. The corroboration which did exist supported Zimmerman. He produced a photograph of his father, taken at about the time of the invention, which showed his father standing in front of a lathe, wearing the rectangular shaped, spiral wound belt buckle. This belt buckle was introduced into the record as an exhibit, was a part of the evidence considered by Judge Kennedy, and has been examined by this court.

Zimmerman's testimony concerning this belt buckle was as follows:

Q Now, what instructions if any did Mr. Campbell give you to make the first model?

A None.

Q How and when did you get the concept of making a spiral wound spring feed tube with coating?

A I conceived the basic idea at the home of my parents' while discussing the problem of flexible feed track with my father.

Q I refer you to Exhibit 44 and ask you if you can tell the Court what that exhibit is and what it shows.

A This is a picture of my father. It shows him standing in the living room of the cottage of my mother-in-law and father-in-law and he's standing by a model of a galleon which I built and presented to them for use in the cottage.

Q Now, I show you Exhibit 45 and ask you what relation if any does that exhibit have with the making of the first open-flex model?

A This particular exhibit is a belt my father was wearing that Friday night that we discussed the flexible feed track problem. Actually, my sight of the spring wire-wound buckle was the starting concept of coming up with an answer for flexible feed track. I had never seen rectangularly wound springs before and this particular belt buckle caused me to ask my father why we couldn't wind such a rectangular spring, and his indication was, at that point was there was no reason as long as the lathe and the spring winding attachment could be adapted to it.

Q You said you had never seen rectangular wound spring wire. You mean at the time you made your first model.

A That's right. At the time I saw this belt, this was the first time I ever even imagined it would be done or could be done.

Q Do you now know that it had been done before that time?

A Oh, yes. In reading articles out of old issues of Automation Magazine and so forth we have seen a number of presentations describing a rectangular wound wire used for feed track.

Q Now, is there any relation between the belt of Exhibit 45 and 44?

A Exhibit 44, the picture of my father, shows him wearing the belt.

Another witness, who was also employed by Campbell Machines Company at the time of the invention, corroborated the testimony that the covering did not bond to the first prototype, and that the slot was machined primarily for the purpose of removing the track from the mandrel, both in accordance with Zimmerman's testimony.

The District Court recognized that this corroboration was circumstantial, but found that in view of all the evidence Spectrum had met the "heavy burden" of proving that Zimmerman, not Campbell, was the true inventor.

The findings of fact and conclusion of law of Judge Kennedy as to the true identity of the inventor are made an Appendix to this opinion.

Campbell contends that, in spite of the express factual findings of the District Court, the validity of the patent is established as a matter of law by the statutory presumption of validity, 35 U.S.C. § 282, and by the related requirement that oral testimony must be corroborated.

Section 282 requires that: "A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it." This provision codifies the law prior to its enactment, see S.Rep.No.1979, 82d Cong., 2d Sess. (2 U.S.Code Cong. & Admin.News,

pp. 2394, 2422 (1952)). Even though this presumption makes patentees "heavily favored as a class of litigants," Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 335, 91 S.Ct. 1434, 1446, 28 L.Ed.2d 788 (1971), it leaves unspecified the quantum of proof necessary to meet the "burden of establishing invalidity."

The Supreme Court first commented on the presumption of validity in Coffin v. Ogden, 85 U.S. (19 Wall.) 120, 124, 21 L.Ed. 821 (1873), stating that "every reasonable doubt" should be resolved against the party asserting invalidity. Oral testimony of unpatented prior art was found in that case to defeat the patent. The Supreme Court emphasized that the unreliability of such oral testimony "bring[s] the case made by the appellees within the severest legal tests which can be applied . . .." Id. at 125. Subsequently Cantrell v. Wallick, 117 U.S. 689, 6 S.Ct. 970, 29 L.Ed. 1017 (1886) involved a contention of prior use sought to be proven by oral testimony. The Court again held that "every reasonable doubt" should be resolved against the party asserting invalidity. Id. at 696, 6 S.Ct. 970. In The Barbed Wire Patent, 143 U.S. 275, 284, 12 S.Ct. 443, 447, 36 L.Ed. 154 (1891), the Court held that when an unpatented device, the existence and use of which are sought to be established by oral testimony, is set up as a complete anticipation of a patent, the proof sustaining it must be "clear, satisfactory and beyond a reasonable doubt." The rationale for this strict standard was explained as follows:

> We have now to deal with certain unpatented devices, claimed to be complete anticipations of this patent, the existence and use of which are proven only by oral testimony. In view of the unsatisfactory character of such testimony, arising from the forgetfulness of witnesses, their liability to mistakes, their proneness to recollect things as the party calling them would have them recollect them, aside from the temptation to actual perjury, courts have not only imposed upon defendants the burden of proving such devices, but have required that the proof shall be clear, satisfactory and beyond a reasonable doubt. Witnesses whose memories are prodded by the eagerness of interested parties to elicit testimony favorable to themselves are not usually to be depended upon for accurate information.

> Indeed, the frequency with which testimony is tortured, or fabricated outright, to build up the defence of a prior use of the thing patented, goes far to justify the popular impression that the inventor may be treated as the lawful prey of the infringer. 143 U.S. at 284–85, 12 S.Ct. at 447.

The source of the "clear and convincing" standard springs from these early decisions, wary of the dangers of accepting parol evidence exclusively to prove facts which are established more reliably by documentary evidence. See Deering v. Winona Harvester Works, 155 U.S. 286, 301, 15 S.Ct. 118, 124, 39 L.Ed. 153 (1894) ("evidence so cogent as to leave no reasonable doubt"); Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 60, 43 S.Ct. 322, 67 L.Ed. 523 (1923); 9 Wigmore, Evidence § 2498 at 333.

These earlier Supreme Court cases seem to have confined this strict standard to those cases where a prior use was undertaken to be proved by oral testimony. An apparent expansion of this rationale was established in 1934 in Radio Corporation of America v. Radio Eng'r Laboratories, 293 U.S. 1, 8, 54 S.Ct. 752, 755, 78 L.Ed. 1453 (1934) where the court stated broadly:

> Through all the verbal variances, however, there runs this common core of thought and truth, that one otherwise an infringer who assails the validity of a patent fair upon its face bears a heavy burden of persuasion, and fails unless his evidence has more than a dubious preponderance.

In Smith v. Hall, 301 U.S. 216, 233, 57 S.Ct. 711, 718, 81 L.Ed. 1049 (1937), the

Court referred to "the heavy burden of persuasion which rests upon one who seeks to negative novelty in a patent by showing prior use." *But see* Williams Mfg. Co. v. United Shoe Machine Corp., 316 U.S. 364, 392–94, 62 S.Ct. 1179, 86 L.Ed. 1537 (1942) (Black, J., dissenting).

We find no recent decisions of the Supreme Court delineating the burden of proof in patent validity actions. The application of the "clear and convincing" standard varies among the Circuits. Two Circuits seem to apply the "clear and convincing" standards regardless of the asserted ground of invalidity. *See* Hobbs v. United States, 451 F.2d 849, 856 (5th Cir. 1971); Universal Marion Corp. v. Warner & Swasey Co., 354 F.2d 541, 544 (10th Cir. 1965), cert. denied, 384 U.S. 927, 86 S.Ct. 1444, 16 L.Ed.2d 530 (1966). Four Circuits have applied the standard in cases where patented prior art has been urged as a ground for invalidity, without explication. *See* Trio Process Corp. v. L. Goldstein's Sons, Inc., 461 F.2d 66, 70 (3d Cir.), cert. denied, 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262 (1972); Ever-Wear, Inc. v. Wieboldt Stores, Inc., 427 F.2d 373, 375 (7th Cir. 1970); L & A Products, Inc. v. Britt Tech Corp., 365 F.2d 83, 86 (8th Cir. 1966); Moon v. Cabot Shops, Inc., 270 F.2d 539, 541 (9th Cir. 1959), cert. denied, 361 U.S. 965, 80 S.Ct. 596, 4 L.Ed.2d 546 (1960). We find two Circuits that have applied a lesser standard to the usual patent case. Rains v. Niaqua, Inc., 406 F.2d 275 (2d Cir.), cert. denied, 395 U.S. 909, 89 S.Ct. 1751, 23 L.Ed.2d 222 (1969) (preponderance of the evidence); Universal Inc. v. Kay Mfg. Corp., 301 F.2d 140, 148 (4th Cir. 1962).

This Circuit has applied the clear and convincing standard in cases involving facts comparable to the situation presented in the case at bar. In Acme Highway Products Corporation v. D. S. Brown Co., 431 F.2d 1074, 1083 (6th Cir. 1970), cert. denied, 401 U.S. 956, 91 S.Ct. 977, 983, 28 L.Ed.2d 239 (1971), this court stated that:

> The fact that a patent was issued in the name of Alfred F. Crone, as sole inventor, is *prima facie* proof of that fact. The burden upon Brown in making an assertion to the contrary of this presumption is very high. The temptation for honest witnesses, who have worked years with a patentee to implement his ideas, to forget whose ideas they were, is very strong. For this reason, it has been well established that joint inventorship must be proven by clear and convincing evidence.

In W–R Co. v. Sova, 106 F.2d 478, 481 (6th Cir. 1939) we stated that "the defense of invention by another must be established by the clearest proof. . . ."

■ We conclude that the clear and convincing standard should be applied in the present case. In doing so, we do not commit this Circuit to any general rule requiring the application of this standard in all patent cases.

In Stamicarbon, N.V. v. Escambia Chemical Corp., 430 F.2d 920 (5th Cir.), cert. denied, 400 U.S. 944 (1970), 91 S.Ct. 245, 27 L.Ed.2d 248, Judge Wisdom stated that the authorities dealing with the issue of the quantum of proof required to overcome the presumption of validity are "in a morass of conflict." 430 F.2d at 924. We do not undertake in this opinion to reconcile these conflicts. Our decision is confined to the factual situation presented in the case at bar. We expressly reserve a decision as to when the clear and convincing standard should be applied in other situations involving the statutory presumption of validity.

■ Consideration of the record in the present case convinces us that the evidence is sufficiently strong to satisfy the "clear and convincing" standard, and that the District Court was correct in finding that Spectrum has carried this "heavy burden."

Campbell's assertion that the proof is insufficient as a matter of law because of the need for corroboration also must fail. While it is true that uncorroborated testimony is highly suspect, the fact finder takes this into account by application of a strict standard of proof. In

W–R Co. v. Sova, *supra,* 106 F.2d at 481, this court stated:

It is also true that human recollection is not always dependable. It is weakened by the frailty of memory and tainted by personal interest. Consequently, when dealing with dates or details long since past of the development of a mechanical device, and oral testimony of when the device emerged from the experimental to the finished stage, the Court cautiously weighs such testimony. If, however, all the facts and circumstances convince a reasoning mind that such testimony is unimpaired by faulty memory or unimpeached by personal interest, it is as effective to establish prior invention or public use as written documents. American Roll-Paper Company v. Weston, 6 Cir., 59 F. 147.

Professor Wigmore approves of this rule, and further explains its rationale. When a prior use is asserted (a situation analogous to the present case),

the assertion of the rival claimant that his conception and use of the invention were prior in time will often describe conduct and events taking place in the privacy of his own workshop or home. Such assertions are easy to make and hard to meet. Accordingly, a rule of practice has grown up in the United States Patent Office declaring that the alleged inventor's uncorroborated testimony will not suffice. But this rule has not been definitely sanctioned by the Federal Supreme Court.

Nor should it be. There can be no need for such a rule of law . . ., especially where the evidence is weighed by a seasoned official acting without a jury. If the official does not believe the claimant's assertion, his own reasoning suffices to support his judgment of credibility. If he does believe the assertion, he should not be hampered by a fixed rule of thumb interfering with that judgment. That he should be cautious in relying on such assertions, is unquestioned. . .

(Footnotes omitted.) 7 Wigmore, Evidence § 2065a.

It is to be emphasized that in the present case there is not a complete lack of corroboration. The circumstantial evidence heretofore summarized in this opinion, including the father's belt buckle, substantiates Zimmerman's testimony. We hold that Judge Kennedy's findings of fact and determinations of credibility, coupled with the corroboration, sustain the heavy burden necessary to establish that Zimmerman, not Campbell, is the true inventor.

██ Since the patent is invalid because Campbell is not the true inventor, it is unnecessary to reach the other issues of validity or infringement decided adversely to Campbell in the District Court.

Affirmed.

Costs are taxed against appellant.

## APPENDIX

### *Findings of Fact*

1. Plaintiff MILFORD A. CAMPBELL, a citizen of the State of Michigan, is the owner of United States Patent No. 3,002,600, issued October 3, 1961, entitled "Flexible Feed Track," on an application filed January 26, 1959, in the United States Patent Office. The patent is in force until October 3, 1978;

2. Plaintiff CAMPBELL is president of CAMPBELL MACHINES COMPANY of Novi, Michigan, which has an oral license under the patent in suit, and which sells the patented flexible feed track to the trade under the name, "Open-Flex;"

3. Defendant's SPECTRUM AUTOMATION COMPANY is a Michigan corporation having its principal place of business in Livonia, Michigan, and is a manufacturer and seller of flexible feed track known as the "Maxi-Flex" track;

4. Plaintiff MILFORD A. CAMPBELL is a citizen of the State of Michigan;

5. The flexible track disclosed in Patent No. 3,002,600 is manufactured and

sold by the CAMPBELL MACHINES COMPANY of Novi, Michigan, under the trademark, "Open-Flex." The "Open-Flex" feed track, as described in the Patent, consists of a plurality of segments which are each formed of wire, and each of which has a cross-sectional shape corresponding to the article which is to be conveyed by gravity along an irregular path by the track. The segments are disposed in a side-by-side relationship and they are maintained in said relationship by a bonded coating of flexible material on the outer surfaces thereof. The "Open-Flex" feed track is used to convey articles by gravity between various production machines;

6. Prior to 1958, CAMPBELL MACHINES made and used gravity feed tracks which were formed of sheet metal in the shape of the part and bent into the proper configuration or it used plastic tubing;

7. Metal track had to be fully fabricated at the time of manufacture and could not be cut or modified in the field at the time of installation. It also had the disadvantage of limitations in its flexibility and was difficult to use in a limited or confined area or where there were many tracks or other obstructions to avoid;

8. Plastic tubing had the advantage of flexibility; however, plastic track had a shorter wear life than steel track. Moreover, unless the plastic tubing was required in sufficient quantity to spread the cost of molds, etc., or was in some standard size, it was expensive. Plastic track also had the advantage that it could be cut and shaped in the field at the time of installation;

9. Track formed of spring wire wound into a coil having a cross section accommodating the shape of the part to be moved was also in use as a gravity feed track;

10. Plaintiff MILFORD A. CAMPBELL had considerable experience in designing and building industrial components for storing, elevating, orienting, sorting, inspecting, et cetera, small industrial parts being fed to production machines. He formed CAMPBELL MACHINES COMPANY in the fall of 1954. The company designed and manufactured such components;

11. Mr. CAMPBELL attended General Motors Institute of Technology at Flint, Michigan, for more than four years and completed the program for a B. S. degree, except for writing his thesis. Mr. CAMPBELL worked at various General Motors plants while attending G. M. Institute. He was then employed by F. L. Jacobs, a car parts manufacturer. This employment involved parts handling. He had further employment at Cargill Detroit Corporation for about four years. This company built a variety of automated equipment. Mr. CAMPBELL had not had direct experience with spirally-wound feed track during his industrial experience;

12. Richard D. Zimmerman, president of defendant SPECTRUM AUTOMATION COMPANY, was previously employed at CAMPBELL MACHINES COMPANY. He commenced work at CAMPBELL MACHINES COMPANY in November, 1957, as a product designer and was so employed until 1959;

13. Richard Zimmerman, is president of SPECTRUM AUTOMATION COMPANY. He previously was an employee of CAMPBELL MACHINES COMPANY. Before commencing work at CAMPBELL MACHINES COMPANY, Mr. Zimmerman worked for the Bower Roller Bearing Company, and such work included working with designers in the development of parts-feeder machines, and parts-handling machines. The parts-feeding machines included floor feeders, conveyors, hoppers, orientors, escapements, feed tracks and chuting for the distribution of bearing components for assembly and processing. While there, he worked with spirally-wound feed chutes;

14. Prior to commencing work at CAMPBELL MACHINES COMPANY, Mr. Zimmerman also worked for five years as a co-op student, working every other month, in earning a Bachelor of Mechanical Engineering degree in 1957,

from the General Motors Institute of Technology, Flint, Michigan. His co-op periods were spent mostly at the Detroit Diesel Engine Division of General Motors, Detroit, Michigan, where his work assignments included product engineering, product development, process engineering section as an assistant in the utilization of parts-feeding equipment, plant engineering. He also spent several months of the co-op work periods at the Hydra-Matic Transmission Division of General Motors, working on the re-tooling of the Hydra-Matic plant, after it was burned down, on parts-feeding matters;

15. During the early part of 1958, CAMPBELL MACHINES COMPANY received a purchase order for a number of storage feeders from a company called "A. E. Parker & Sons", of Howell, Michigan. These feeders were for the purpose of feeding welch plugs to an automotive engine assembly station that A. E. Parker & Sons was building for Oldsmobile Division of General Motors;

16. Mr. Zimmerman was assigned the task of designing and releasing the complete manufacturing information for the A. E. Parker & Sons' storage feeders to the production shop of CAMPBELL MACHINES COMPANY. Many of the component parts, such as the feeders, it should be noted, were already designed. There remained the design and release of feed track to get the parts from the machines to the customer's work station. Because of the congestion problems in the small work station area, it was very difficult to get all the necessary fabricated steel feed track into the limited space. Mr. CAMPBELL suggested extruded plastic track to perform the feed track function but it was not available at reasonable cost;

17. Plaintiff MILFORD A. CAMPBELL testified that confronted with this problem he conceived the invention of "Open-Flex" just as it was later manufactured and patented, and that he gave full directions to Mr. Zimmerman as to how to manufacture it. These directions, he testified, included the slot and were complete in all respects. Mr. Zimmerman expressly denies he was ever given such directions by Mr. CAMPBELL. The Court does not believe Mr. CAMPBELL's testimony;

18. Mr. Zimmerman testified that he discussed the problem of providing a flexible feed track to carry out the feeding function for the A. E. Parker & Sons' machine with his father who was an experienced and skilled tool and die maker. Although Mr. Zimmerman was also a tool and die maker he did not know that a spring could be wound in a rectangular shape. In the discussion with his father, Mr. Zimmerman reviewed hoses and tubes which use a spring wire spirally-wound body covered with a flexible coating, such as a vacuum hose. Mr. Zimmerman while with Bower Roller Bearing had seen spirally-wound feed track or feed chutes. These were sometimes wrapped with electric tape. Mr. Zimmerman's father was wearing a spring tension belt buckle at that time with a rectangular cross-section. From this, Mr. Zimmerman conceived the idea of a spirally-wound, rectangularly-shaped feed track, a flexible feed track with a rectangular cross-section. Mr. Zimmerman's father helped Mr. Zimmerman wind such a track which Mr. Zimmerman then showed to Mr. CAMPBELL. The Court believes the testimony of Mr. Zimmerman;

19. Mr. Zimmerman knew that winding round feed track on a round mandrel using spring wire was simple because it was easy to get the wound wire off the mandrel when the track had been wound. Mr. Zimmerman also knew that if he were to make a rectangular mandrel and wind wire on it, it would be impossible to withdraw the mandrel after the track had been coated. Accordingly, it was concluded that the only way to make this track was to make the rectangular mandrel in a minimum of three pieces. After the coating operation was completed, all that would be needed would be to grind a slot in the side of the feed track mandrel assembly and remove a center section of mandrel out

through the slot. Mr. Zimmerman explained the idea to Mr. CAMPBELL the next work day who immediately rejected it because of the cost of grinding the slot in the side of the feed track;

20. Both parties conceded that the first track was wound on a lathe at Mr. Zimmerman's father's home. A mandrel of three pieces was used;

21. Mr. Zimmerman testified that the slot was incorporated into the manufacturing process because of the inability to get the wound wire spring off the square mandrel. The Court believes this testimony. The wound wire tends to "dig in" at the corners and is much harder to remove from the square mandrel even when the corners of the mandrel are slightly rounded than from a round one. Mr. Zimmerman's testimony about the difficulty of getting the spirally-wound wire off a square mandrel was confirmed by the testimony of CAMPBELL MACHINES COMPANY's present employee, Herbert T. Sounder. During all the time Mr. Zimmerman was with CAMPBELL MACHINES, "Open-Flex" was made with a slot [page 1129]. (Mr. Zimmerman was with CAMPBELL MACHINES from 1957–1959 and, again, from 1965–1969);

22. Mr. CAMPBELL testified that the slot was a part of his original invention as he conceived it and that its purpose was to permit dirt to escape and to allow physical inspection of the parts. Although the slot performs these functions, the Court does not believe it was a part of any original idea of Mr. CAMPBELL's but came into existence as a necessary part of the manufacturing process, as Mr. Zimmerman testified;

23. The slot in the feed track was a by-product of the method of manufacturing the track. The slot was made to remove the mandrel;

24. Although Mr. CAMPBELL testified that he conceived "Open-Flex" in its totality, the Court finds that the bonding step developed from the need to have the coating hold the individual segments of the slotted track together;

25. Mr. Zimmerman with his father's help conceived the idea of the "Open-Flex" feed track;

26. The Application from which Patent No. 3,002,600 matured was filed under the name of MILFORD A. CAMPBELL, who was not the inventor of the flexible feed track disclosed and claimed in said Application;

27. Mr. Zimmerman has no documents to support his claim of conceiving the idea of "Open-Flex". He does have a photograph of his father, taken at about that time, wearing the rectangularly-wound belt buckle, and the buckle itself, or one identical to it; Mr. CAMPBELL has no notes or record to corroborate his testimony;

·        ·        ·        ·        ·

### Conclusions of Law

1. Patent No. 3,002,600 is invalid under Title 35, United States Code, Section 102(b), because MILFORD A. CAMPBELL represented to the United States Patent Office that he was the original, first and sole inventor of the invention disclosed, whereas Richard D. Zimmerman was the original, first and sole inventor. Liberty Combustion Corporation v. Jackson, 253 F.Supp. 848 (D.C.Mich. 1963); Shreckhise v. Ritchie, 160 F.2d 593 (4th Cir. 1947). Plaintiff urges that in view of the presumption of validity of a patent the burden of proving Mr. CAMPBELL is not the inventor is a heavy one. The Court finds that SPECTRUM has met this heavy burden. The instant case is distinguishable from cases such as Smith, Executor v. Hall, 301 U.S. 216, 57 S.Ct. 711, 81 L.Ed. 1049 (1937), where an alleged infringer sought to show that a similar product was in use prior to plaintiff's patent. The Court there held that "oral testimony . . . without corroboration . . . is insufficient to establish prior use." In the instant case there is corroboration albeit circumstantial.

There is Mr. Zimmerman's father's rectangularly wound belt buckle, the existence of which at that time was established by documentary evidence. There

is the evidence as to the difficulty in removing the rectangularly wound wire from a mandrel. There is the evidence that coating on the first "Open-Flex" did not stick (corroborated by plaintiff's present manufacturing manager, Herbert T. Sounder), all of which proves conclusively to the Court that Mr. CAMPBELL did not, as he claims, conceive the idea of "Open-Flex" exactly as it is now made. Moreover, the situation presented to the Court where two persons who worked together claim to be the inventor is different from that of an alleged infringer claiming prior use. Here Mr. CAMPBELL is not confronted by matters not within his knowledge or which he cannot refute. In cases where the question is who is the inventor, the courts must and, indeed, do rely upon oral testimony. See *Shreckhise, supra*; DeForest v. Owens, 49 F.2d 826 (Cust. & Pat.App.1931); *Liberty Combustion, supra.*