GAF CORPORATION

v.

AMCHEM PRODUCTS, INC.

GAF CORPORATION

v.

AMCHEM PRODUCTS, INC., Anson R. Cooke, Wilbur F. Evans and Charles D. Fritz.

Civ. A. Nos. 72–1994, 75–1730.

United States District Court,
E. D. Pennsylvania.

May 13, 1981.

K. Robert Conrad, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for plaintiff.

C. Frederick Leydig, Leydig, Voit, Osann, Mayer & Holt, Chicago, Ill., for defendants.

## SUR PLEADINGS AND PROOF

LUONGO, District Judge.

This action consists of two complaints, one filed in 1972, and the other filed in 1975. A common issue in both is inventorship of the use of the chemical 2–chloroethylphosphonic acid as a plant growth regulator. Defendant, Amchem Products, Inc. (Amchem), is the current holder of numerous foreign and domestic patents stemming from the invention. Plaintiff, GAF Corporation (GAF), seeks, *inter alia*, in the 1972 action, 399 F.Supp. 647 (E.D.Pa.1975), reversed and remanded 570 F.2d 457 (3 Cir. 1978), to have Amchem declared a constructive trustee of all rights to foreign patents stemming from the invention. It claims that its employee, Dr. David I. Randall, invented the use of 2–chloroethylphosphonic acid as a plant growth regulator in 1966 and that Amchem misappropriated the invention through breach of a confidential relationship between the parties and derived its patent position from Dr. Randall's conceptions.

In 1975, GAF filed another suit, naming individual defendants in addition to Amchem. The 1975 suit, in part, requests similar relief in relation to United States Patent No. 3,879,188 (the '188 Patent). It also seeks a declaratory judgment of the invalidity of the '188 patent and states a claim under the antitrust laws. The 1975 action is affected by this trial only to the extent that GAF's claims in that action are predicated on its claim that Dr. Randall invented the plant growth regulating use of the acid.

Pursuant to my pretrial order dated April 17, 1979, the trial of this action is to be

conducted in two phases: (1) the liability phase, in which will be determined the issues of (a) Dr. Randall's alleged discovery or inventorship of the plant growth regulating use of the acid, and (b) if Randall was an inventor of the use, whether GAF is barred by laches or estoppel from claiming it, and (2) the relief phase, in which will be tried the issues of the relationship between the uses for the acid claimed in the various foreign patents and U. S. '188 Patent and the alleged Randall discovery or inventorship.

The liability phase of the case was tried from December 1–11, 1980. Following completion of the evidence, consisting of about 1,500 pages of testimony and more than 360 exhibits, the parties submitted requests for findings of fact and conclusions of law together with memoranda of law. On pleadings, proof, and the written submissions of the parties, I make the following

## I. FINDINGS OF FACT

### A. *The Parties*

1. Plaintiff, GAF Corporation, is a Delaware corporation with its principal place of business in New York, New York.

2. Defendant, Amchem Products, Inc., was, at the time of the initiation of both the 1972 and 1975 actions, a Pennsylvania corporation with its principal place of business in Ambler, Pennsylvania. During the pendency of these proceedings, Amchem has been succeeded by Union Carbide Agricultural Products Company, Inc., a wholly owned subsidiary of Union Carbide Corporation. To obviate confusion, I will continue to refer to defendant as Amchem.

3. Dr. David I. Randall was an employee of GAF who, at all times relevant to this dispute, held the position of Senior Scientist (T 102).[1] Although not formally a party to this dispute, Dr. Randall is claimed by GAF to have been either the sole inventor or a joint-inventor of the use of 2–chloroethylphosphonic acid as a plant growth regulator.

Dr. Randall died on December 20, 1979 (T 48).

4. Dr. Anson R. Cooke is currently, and was at all times relevant to this dispute, group leader of biological research in herbicides and plant growth regulators at Amchem (T 1028–1029). He is one of the named inventors of record of the use of 2–chloroethylphosphonic acid to achieve plant growth regulation.

5. Charles David Fritz (Fritz) is an employee of Amchem. During the years relevant to this dispute he conducted various tests on chemicals submitted to Amchem for testing by other companies including GAF (T 1314). He is also listed as an inventor of the invention being contested herein.

6. Wilbur Fell Evans (Evans) is an employee of Amchem. During the period relevant to this dispute he conducted primary screening tests on chemicals submitted to Amchem for testing by other companies including GAF (T 1404). He is also one of the inventors of record of the plant growth regulating use of 2–chloroethylphosphonic acid.

### B. *The GAF-Amchem Relationship*

#### a. *The Screening Agreement*

7. GAF, a chemical producer, lacked facilities to test chemicals it produced for various end uses including biological activity on plants (T 1552). Prior to 1960, it employed a consultant to screen its chemicals for agricultural uses (T 104).

8. In 1960 GAF's management wanted to increase its research efforts in the area of screening chemicals for various end uses. Eventually GAF, dissatisfied with its consulting arrangement, explored the possibility of entering into a relationship with Amchem for the screening of its chemicals for agricultural purposes (T 104, TX 54). Amchem was in the business of developing agricultural chemicals and maintained facilities for screening chemicals developed by other companies for use as herbicides and plant growth regulators (TX 54).

---

**1.** References herein to the transcript will be by the letter "T" and to trial exhibits by the letters "TX".

GAF also entered into screening relationships with other companies for testing the utility of its compounds for other end uses (TX 20).

9. On September 5, 1961, GAF and Amchem entered into a screening agreement (TX 56) which was subsequently amended on June 29, 1966 (TX 311).

10. Under the terms of the screening agreement GAF would, from time to time, submit to Amchem lists of chemical compounds for possible screening. Amchem would then select from GAF's list the chemicals which it was willing to screen. GAF would then furnish Amchem with a sample of each chemical compound which Amchem had selected. Upon receipt of the samples, Amchem would promptly "initiate a program to evaluate and test each such selected chemical as a herbicide" (TX 56, ¶ 1–2). Amchem was contractually bound to submit reports to GAF at least twice a year indicating what chemicals were still being screened (TX 56, ¶ 2).

11. The screening agreement permitted GAF and Amchem to file patent applications covering their respective inventions (TX 56, ¶¶ 3–4). The agreement further provided for the licensing of such patent rights by each to the other at negotiated rates (TX 56, ¶ 8–9) and envisioned that, if possible, GAF would manufacture chemicals which Amchem developed under the agreement (TX 56, 196).

b. *GAF's Procedures Under the Screening Agreement*

12. Within GAF the responsibility for selecting the chemicals which had been synthesized by GAF at its Central Research Laboratory (CRL) in Easton, Pennsylvania, and other facilities for submission to Amchem and other screeners resided in Dr. Max Chiddix. During 1965–1966, Dr. Chiddix was the program manager at CRL for organic research (T 108).

13. Dr. Chiddix partially delegated the responsibility for selecting compounds for the screening programs to Joseph Copes (Copes) who was employed as a chemist by GAF at CRL (T 108, 758).

14. Copes' task was to select samples for the respective screening arrangements to which GAF was a party (T 758). For each compound he received from the various GAF laboratories nationwide, Copes prepared a compound sheet and assigned a number with the prefix CRL (T 765). The compound sheet had two sections. The top section had noted thereon the CRL number of the compound, its chemical structure and empirical formula, its concentration, and the initials of the chemist who synthesized it as well as a reference to the page of the chemist's notebook where the synthesis was recorded (T 767, TX 5, 20). The bottom section noted the screener to which the compound was sent and the results of that screener's testing. (TX 20).

15. For the Amchem screening agreement, Copes attempted to formulate a list of 40 compounds a month (T 769) which he would then submit to Dr. Chiddix for his perusal and approval (T 109).

16. Dr. Chiddix and Copes used very broad criteria in selecting the compounds which would go to Amchem, *i. e.*, that surface active agents[2] such as detergents, and polymeric chemicals were rarely active as herbicides (T 114, 182), but any other type of chemical was viewed as a possible entrant into the Amchem screening program (T 114, 182). The only criterion that Copes developed on his own was to make a list consisting of structures as diversified as possible (T 769).

17. GAF had no express criteria for selecting compounds because it is virtually impossible to predict agricultural or biological activity on the basis of the chemical structure of a compound (T 184–185, T 1042, T 1542–43, TX 54 at 389).

18. Upon approval by Dr. Chiddix, the list was sent to GAF's Commercial Develop-

---

**2.** A surface active agent, also known as a surfactant is "[a]ny compound that reduces surface tension ... when dissolved in water or water solutions, or which reduces interfacial tension between two liquids, or between a liquid and a solid." The Condensed Chemical Dictionary [9th ed. 1977].

ment Department (CDD) in New York (T 110) and was thereafter forwarded to Amchem (T 71, TX 69, TX 83).

19. Amchem did not accept all of the compounds submitted by GAF for testing (T 1040, TX 72, 86). When Amchem noted on a particular list the compounds it wished to screen, Copes would send samples of them to Amchem (T 852).

### c. Amchem's Procedures under the Screening Program

20. The list prepared by GAF was sent to Dr. Cooke who selected those to be screened by Amchem. (See Finding 19). Like Dr. Chiddix at GAF, Dr. Cooke was unable to predict with any degree of certainty whether a new chemical compound would show activity (T 1042). The only guidelines which Cooke used were exclusionary ones. For example, he would not accept for screening any chemicals which were known carcinogens, mercurials, or arsenics (T 1041). The chemicals Dr. Cooke selected were then assigned a number with the prefix G.

21. The selected chemicals were put into testing programs formulated exclusively by Amchem. GAF made no recommendations as to how Amchem should conduct its screening (T 1039).

22. The GAF chemicals were subjected to primary screening tests designed to determine if a particular compound had any biological activity (T 1031).

23. Primary screening tests are conducted as follows: The compounds are dissolved in a solvent or diluting agent for application to the test plants (T 1033) (usually a mixture of different varieties of weed or crop seeds) planted in a wooden flat approximately twelve inches wide, 20 inches long and three inches deep and filled with a specially prepared soil mixture. Fertilizer is then applied to the soil at various rates depending on the season of the year and the growth rates at that time. Two tests are made on each plant to monitor the response of a compound in primary screening. In the first, a pre-emergence test, the seeds are sprayed at a predetermined rate before they germinate (T 1033, 1040–42). In separately planted flats the chemical is applied to the plants after the plants have germinated and have grown to approximately 2–3 inches in height (T 1034, 1140). Untreated control test flats are also planted with the same species as the treated flats (T 1156–36).

24. In conducting the primary screening tests, numerous variables must be considered, including the spraying technique, the formulation and concentration of the chemical, the rate of application of the chemical to the plants, the season of the year and the amount of fertilizer to be applied to the soil (T 1033–34).

25. The treated flats are observed daily by the experimenter to determine if they are showing any variation from the control flat (T 1034). The experimenter looks for any type of biological activity he can observe (T 1043).

26. Approximately 2–4 weeks after the chemical is applied, the experimenter records his final observations on the primary screening card (T 1034, 1406 see, e. g., TX 91, 95, 102). The results are recorded pursuant to a coding system developed by Dr. Cooke in 1963 (TX 65), with activity rated on a scale ranging from 0 (no activity) to 10 (100% activity). Different types of plant activity are coded by the letters A–K (TX 65). For example, under the Cooke coding system, a rating of 4–D means that the treated plants showed 40% defoliation activity, i. e., 40% more of the leaves of all the treated plants in a species abscized (dried up and fell off) as compared to the same species in the control flat (TX 65, T 1138–39).

27. A group known as the Primary Screening Committee, headed by Dr. Cooke, meets at some point after a chemical shows biological activity in primary screening (T 1036) to discuss the primary screening results and to decide whether the compound should be moved into the secondary screening program (T 1037).

28. Secondary screening tests are designed to determine what, if any, potential commercial utility a compound has (T 1036).

In secondary screening the chemical is applied to determine if it will trigger certain responses indicated by the primary screening results. The compound is applied at lower rates more closely resembling commercial applications (T 1035–1038). Those compounds which show possible commercial utility are then placed in an advanced screening program where they are tested under field conditions (T 1031–32).

29. The status of the compounds screened under the GAF-Amchem agreement was reported to Amchem at semi-annual meetings (T 1554). In addition, Amchem submitted a written semi-annual report indicating what compounds were still in the secondary screening program at that time. (*See, e. g.,* TX 135, 207).

30. The instances when commercial compounds have been discovered through the GAF-Amchem screening program have been rare. During the course of the screening relationship, only approximately 15% of the 4,000 chemicals submitted by GAF went into secondary screening (T 1042). Of those, only one, 2-chloroethylphosphonic acid, was commercialized (*id*).

### C. *List 38*

#### a. *Submission and Testing*

31. On March 3, 1965, GAF submitted to Amchem a list (list 38) consisting of 43 compounds. (TX 83, 84, 85). Amchem accepted 37 of the 43 compounds for testing (compare TX 83 with TX 86).

32. Included among the compounds accepted were 2–chloroethylphosphonic acid (the acid), the pyrocatechol ester of the acid (the ester) and the dichloride of the acid (the dichloride) (TX 83, 84, T 111). The acid was coded CRL 3418 by GAF and G–996 by Amchem. The ester was coded CRL 3412 by GAF and G–994 by Amchem. The dichloride was coded CRL 3410 by GAF and G–992 by Amchem. These compounds were all initially synthesized by Dr. S. R. Buc of GAF in a program for developing reactive dyes.

33. Many of the chemicals on list 38 were also offered to other screeners (*e. g.,* Merck and Company, Inc., Niagara Chemical, Parke, Davis & Co., and the National Institute of Health (TX 20)) in order to determine if they had utility as pharmaceutical chemicals, insecticides, agricultural fungicides, etc.

34. The compound sheets for the acid, the ester and the dichloride bore the notation that they were 100% (TX 84). In addition, at least up until sometime in January 1966 when the acid bottle was marked "not pure" (Finding 53), the labels on the bottles in which the samples of the acid and the ester were stored also bore the notation "100%". (*See* TX 897, 898, T 1328–1329).

The notation "100%" was not an assertion that the compound contained no impurities. Normally, there were some impurities in all the samples. The notation "100%" signified the concentration of the sample, *i. e.*, the sample was 100% to the extent that it contained only the named compound with its normal impurities and that nothing, such as an inert material, had been added to dilute the sample (T 168–171).

It was important for Amchem to know the concentration of a sample in order to determine the rates of application in the screening program (T 168). As far back as 1964, Amchem requested that GAF inform it of the compounds which were not pure in order to facilitate the formulation of the compounds for application (TX 72, *see also* T 174–75).

35. The acid sample sent on March 3, 1965, pursuant to list 38 was found not to be 100% in March of 1966 (*see* Finding 88, *infra.*) Tests run on the list 38 acid sample in 1972 and 1973 showed that it actually contained only 10–20% of the acid (TX 830, 851).

36. During March-May 1965, the ester, the dichloride and the impure acid samples were placed in Amchem's primary screening program (see TX 91, 95, 102), the tests being conducted by Evans (TX 91, 95, 102, T 1405–1412) and witnessed by Fritz (TX 91, 95, 102).

37. The dichloride, the ester and the acid all showed some defoliation activity on snapbeans in primary screening. The acid

received a 4–D rating (indicating 40%) whereas the ester and the dichloride received a rating of 6–D (indicating 60%) (*see* TX 91, 95, 102, T 1046–1052). Defoliation is a plant growth response manifested by the abscission of the plant's leaves (T 322–323, 330).

The ester was also given a rating of 10–K [3] based on the observation by Evans of tillering of wild oats (TX 102, T 1411–1412). Tillering, the growth of additional buds from the plant stem, is a plant growth response which is an indication that apical dominance is being controlled. Apical dominance is the tendency of a plant to grow at its apex, a characteristic which inhibits the growth of lateral buds (T 317–320, 336, 339). Evans' observation that the ester caused tillering of wild oats was significant because increased crop yields and other advantageous effects having commercial value could be achieved through control of apical dominance (T 1051–1052, 1182, 1411).

38. On May 17, 1965, the Amchem primary screening committee met and decided that the acid, the ester, and the dichloride showed sufficient biological activity to warrant placement in the secondary screening program. The acid, the dichloride and the ester were to be tested for defoliation of cotton. Because of the tillering observed during primary screening, the ester was also to be tested for control of apical dominance (TX 111, 112, T 1053, 1054).

39. Fritz ran the secondary screening tests of the acid, the ester and the dichloride for defoliation on cotton plants planted on July 28, 1965 (TX 130, 132, 134). The ester and the dichloride were applied to those plants on November 19, 1965 (TX 132, 134). The acid was not applied until December 2, 1965 (TX 130 at 1). Neither the dichloride, the acid nor the ester caused defoliation of cotton plants (TX 130, 130, 134).

40. On November 29, 1965, after the defoliation tests of the ester were completed, Fritz set aside for possible reuse the cotton plants treated with the ester (T 1319, 1377). Fritz often did this if a compound did not affect the cotton plants because it was very difficult to grow new cotton plants in the greenhouse (T 1376, 1377). Several days after Fritz set the plants aside, he noticed that they showed increased branching and axillary stimulation, *i. e.*, control of apical dominance (T 1180, T 1319–1320). On December 7, 1965, he recorded his observation on a secondary screening card, noting,

> "observation; additional leaf development over entire stem of both plants; several new flowers forming." (TX 134, p. 2; T 1057).

41. Fritz was very excited about his discovery that the ester caused axillary stimulation on cotton plants and immediately reported his finding to Dr. Cooke and others in the screening group (T 1320).

42. Within a few days after Fritz' observation, Dr. Cooke and Fritz decided to run immediately a secondary screening test designed to determine if the application of the ester would result in lateral branching and increased yields on tomato plants (T 1059). Dr. Cooke also planned to take a sample of the ester with him on a scheduled trip to Puerto Rico to test it for the induction of flowering in pineapples (T 1061, 1105).

43. At the time of the Fritz observation (T 1179), the secondary screening tests of the ester for control of apical dominance, which had been ordered at the May meeting as a result of Evans' observation of the tillering of wild oats (*see* Finding 38), had not been run. These tests were to have been run by someone other than Fritz (T 1183). After the Fritz observation, however, Cooke assigned to Fritz the task of screening the ester for control of apical dominance. (*See* T 1181–1182).

44. At approximately the same time that Fritz and Cooke were deciding how to proceed with the ester, they observed the cotton plants which had been respectively treated with the dichloride and the acid in

---

3. In the Cooke coding system the letter K described axillary bud growth on broadleaves and tillering on grasses (TX 65, T 1050).

the secondary defoliation tests and found no lateral branching on either set of these plants (T 1185–1186, 1379). These observations were not recorded because they were informal and not part of a planned test (T 1186, 1381).

45. Dr. Cooke was puzzled by the fact that the acid did not exhibit the same activity as the ester, since he believed that esters of corresponding acids commonly have plant growth regulating qualities very similar to those exhibited by the free acid (T 1061, 1065). Dr. Cooke had held this belief as far back as 1950 when he wrote his master's thesis, and observed (although he was not referring to 2–chloroethylphosphonic acid): "[a]lmost equal activity is obtained from the corresponding salt, amide, or ester [of the acid] which 'in vivo' [meaning within the organism] is hydrolized to the acid." (TX 49, p. 4). On the basis of this belief Dr. Cooke instructed Fritz to conduct tests to determine if the ester was showing a synergistic response (T 1061, cf. T 1343). A compound acts synergistically when it exhibits activity which is greater than the sum of the activity of its component parts. For example, normally where compound C consists of component A which shows 10% activity and component B which shows 10% activity, compound C should show 20% activity. If compound C shows greater than 20% activity, a synergistic response occurs (T 1072, T 1374–1376).

In order for Fritz to determine if the ester was acting synergistically it was necessary for him to test the principal components of the ester, which were the acid and a substance known as catechol (T 374).

46. On December 10, 1965, Fritz began the secondary screening tests on the ester to determine whether it controlled apical dominance in tomato plants. Positive results were recorded on January 17, 1966 (TX 184, T 1323).

47. On December 27, 1965, there was a meeting of the secondary screening commit-

tee at Amchem. A report of this meeting, prepared by Dr. Cooke on the following day, records that the acid, the dichloride and the ester were all dropped from the secondary screening program for defoliation (TX 187, p. 3, T 1063, 1183).

b. *The January 4th Meeting*

48. On January 4, 1966, at the semi-annual meeting held at GAF's headquarters in New York City, Dr. Cooke reported on the status of the GAF compounds which were being tested by Amchem (T 115, 1064, 1554). Dr. Cooke informed the GAF representatives that the ester showed great promise for increasing crop yields through the control of apical dominance (T 116, 1015, 1556). He based his report on his and Fritz' observations of the cotton plants and informal observations of the tomato plants that were undergoing testing at the time of the meeting.[4]

49. Dr. Cooke also reported the negative results of the secondary screening tests of the acid, the ester and the dichloride for defoliation of cotton and informed GAF that these compounds were no longer being tested for that activity (T 1065, see T 88–92, 838, TX 191).

50. Dr. Cooke, both orally and in writing, requested that GAF supply Amchem with an additional 50 gram sample of the ester for further secondary screening. (TX 189, T 118, T 1065). Dr. Cooke also informed GAF that he wished to test as many analogs (related chemicals) of the ester as possible for activity (T 245, 1556). That GAF was to formulate these additional samples and analogs was reflective of the fact that GAF "performed . . . as a technical service laboratory" for Amchem (T 720).

51. Dr. Cooke mentioned that he was puzzled by the difference in activity between the ester and the acid (T 1066). The question was raised as to whether the acid sample was in fact pure and someone from GAF said that they would determine if Amchem had been given a good sample (T

4. Although the results of the tests on the tomato plants were not formally recorded until January 17, 1966 (TX 184), informal observations must have been made because it is undisputed that Dr. Cooke discussed the ester's effect on tomato plants at the January 4th meeting (TX 191, 194).

1065–1066). At trial Dr. Cooke did not identify the person who stated that he would check on the acid's purity.

Although the GAF representatives who were present at the meeting denied at trial that the purity of the acid was ever discussed (see T 92–93, 95, T 117, T 254–255), I accept as credible Dr. Cooke's testimony in light of his and other Amchem employees' conduct and actions both prior to and after the January 4 meeting (see T 1065, 1066 supra, Findings 45, 53, infra). I find that at the January 4 meeting, Dr. Cooke did communicate to GAF his continuing interest in the acid as it related to the ester's activity (T 1065–1066). I find further that Dr. Cooke informed GAF that the acid was "dropped" by Amchem only insofar as it was no longer being tested for defoliation activity (T 1065–1066, see TX 207).

52. One of the GAF employees present at the January 4, 1966 meeting was Dr. David I. Randall. Dr. Randall, a senior scientist, was in charge of a research program for the synthesis of herbicides at GAF (T 102–102a). He attended the meeting because the Amchem test results were important to his research program (T 118). He also was assigned the task of synthesizing analogs of the ester (T 266, 1556). Dr. Randall did not actively participate in this meeting since it was his first formal exposure to the Amchem screening program (T 265).

c. The Events at Amchem after the January 4th Meeting

53. When Dr. Cooke returned to Amchem he had a discussion with Mrs. Nancy Gallagher, an Amchem chemist, and Fritz concerning the results of the meeting. Dr. Cooke informed them that the acid's purity was suspect (T 1070, 1344, 1395) and told Fritz not to use the original acid sample in the synergistic studies they had planned in December (T 1070, 1343). Shortly after this discussion, Mrs. Gallagher marked the primary screening card for the acid with the words "This is an impure sample," (T 1395, TX 91) and Fritz noted on the label of the acid sample bottle "not pure" (T 1328, see TX 894, 895, 897).

54. Amchem continued the secondary screening of the ester over the following months. On January 10, 1966, while on a field trip to Puerto Rico, Dr. Cooke applied the ester to pineapple to determine if the ester could force the blossoming of that species (T 1068–1069, TX 202). The induction of flowering in pineapples is a plant growth response which is associated with the presence of ethylene, a plant growth hormone (see Finding 71). He had planned this test in December (Finding 42). On a return trip the following month, Dr. Cooke learned that the test failed due to the fact that he had applied the sample in a manner which killed the growing bud of the plant (T 1069).

55. On February 3, 1966, Dr. Cooke sent GAF a written Semi-Annual Report which indicated that while the ester was still being tested for control of apical dominance, the acid, the dichloride and the ester were no longer being screened for defoliation activity (TX 207).

56. On February 4, 1966, Fritz and Evans executed an invention disclosure relating to the activity of the ester. Dr. Cooke signed it as a witness (TX 211). The disclosure did not discuss the acid (TX 211, T 1120).

57. On that same day Fritz began to run the synergistic studies which he and Dr. Cooke had discussed in December (TX 208, T 1370–1373). Because the purity of the acid was suspect, only the ester and the chemical catechol were applied to the plants at this time (TX 208, 243, 244). Fritz planned to finish the synergistic tests when a pure sample of the acid became available (compare TX 243 & 244 with 263, T 1349–1351, 1370–1371).

58. Dr. Cooke requested that GAF submit an additional one pound sample of the ester in a letter to Dr. Leonard of GAF dated February 4, 1966. He also again requested that GAF submit analogs of the ester so that Amchem could be sure that it was "going with the most active compound." In this letter Dr. Cooke also questioned the ester's stability, pointing out that

when water was added to the ester for formulation of the plant spray, the ester tended to come out of solution and became warm (TX 210).

59. On February 6, 1966, Dr. Randall began work on preparing analogs of the ester (TX 212).

60. On February 15, 1966, Dr. Leonard of GAF responded to Dr. Cooke's inquiry concerning the stability of the ester. He wrote that his laboratory people felt that the activity observed by Dr. Cooke might have been due to the heat of solution and the compound's limited solubility (TX 218).

61. On March 1, 1966, Dr. Cooke met with Dr. Katz of GAF at Amchem's research farm in Ambler (T 1078). A memorandum written by Dr. Katz the following day stated in part:

> [S]ince both Amchem and GAF had noticed a heat of solution when aqueous solutions of this product were made, there may be the possibility that the active ingredient was not compound as submitted to Amchem. Because of this, we were also in the process of doing a definitive characterization study.
>
> (TX 235).

62. Three days later, on March 4, 1966, Dr. Mayhew, the director of GAF's commercial development department, and George Tone, an attorney in GAF's patent department, met with Dr. Cooke at the Amchem farm in Ambler, Pennsylvania (T 907, 1080). The purpose of the meeting was to discuss the patent status of the ester and related compounds (T 1080, 1557). At this meeting Dr. Cooke discussed with Dr. Mayhew and Mr. Tone some of the observations he had made concerning the ester. He again pointed out that the ester tended to be unstable in water and speculated that some hydrolysis may have been occurring (T 1081, 1557, TX 242). According to Dr. Mayhew, Dr. Cooke also discussed the ambiguity between the activity of the ester and the acid and stated that the ester was acting synergistically or possibly that the original samples may not have been pure (T 1557). All of the participants in the meeting agreed that because they were not sure if they were

working with the active component any patent application would be premature at that point (TX 242).

63. Following the Katz meeting of March 1, 1966, Dr. Randall resumed work. This was his first visible work in this area of research since February 7. (*Compare* TX 212 *with* TX 234. T 390). In the course of preparing an additional sample of the ester, Dr. Randall used a method which required the acid as an intermediate. While making the acid he discovered that the first acid sample sent to Amchem on List 38 was impure. (*See* Findings 86–88). On March 11, 1966 he succeeded in preparing a pure sample of the acid (TX 247).

64. On March 10, 1966, before Dr. Cooke was aware that the acid was definitely impure, he used the first sample in a test for rooting of privet plants (TX 328).

65. On March 16, 1966, Dr. Randall personally delivered the pure acid sample [assigned the number CRL 3418A by GAF and G996B by Amchem (TX 260, 263)] to Dr. Cooke (T 1084). He also delivered an additional sample of the ester and two of its analogs (T 1087, TX 254, 256, 259).

66. Dr. Randall's determination that the original acid sample was impure confirmed Dr. Cooke's suspicions as to the authenticity of the initial sample and provided an explanation for the previously unexplained difference between the activity of the acid and the ester (T 1206).

67. Shortly after the pure acid sample was received, Dr. Cooke instructed Fritz to set up a test to determine if the plants treated with the acid showed an epinastic response (T 1157, TX 263). Epinasty is a term describing the downward slope of the petiole away from the plant stem (T 324), and is an indication that growth activity is occurring within the plant (T 1158).

Fritz sprayed the tomato plants with the pure acid on March 29, 1966. Additionally, in the same test, he sprayed the plants with two ester samples, a 50–50 combination of the new acid and catechol and two analogs of the ester (TX 263, T 1333–1334, 1351). On April 6, 1966, Fritz noted that the plants

treated with the acid showed an epinastic response as did the plants treated with the acid and catechol combination, the ester and one of the analogs (TX 263). The plants were allowed to grow another month at which time a significant increase in lateral branching (indicating control of apical dominance) was observed (TX 265). Fritz viewed the March 29th application of the acid, ester and catechol as the synergistic test which he had been unable to run in February (see Finding 57) due to the unavailability of a pure acid sample (T 1351). The results of this test, indicating the comparative effects of the compounds, were recorded on May 5, 1966 (TX 265).

68. During early April Fritz retested the dichloride sample (TX 268, 270). When initially tested the dichloride had been formulated with ethyl alcohol (T 806, 1172). In the retest Fritz formulated the dichloride with water and, on application to plants, this compound induced an epinastic response (TX 270). The reason for the activity in the second test as compared to the first test was that the dichloride hydrolized to the acid in water whereas it had not done so when mixed with ethyl alcohol (T 1172).

Fritz tested the dichloride because he was informed by Dr. Cooke and/or Mrs. Gallagher that the dichloride should be considered an analog of the ester (T 1359–1363). Fritz had a limited chemical background (T 1314–1315), and was unaware that he was actually testing the acid when he tested the dichloride in water (T 1359–1363). Fritz also retested the impure acid sample (T 1363, TX 268). Reflecting his limited chemical background, Fritz felt that a retest of the impure sample would have utility in determining the threshold epinastic response level of the pure acid sample (T 1363, cf. T 1162).

Dr. Cooke testified that he gave Fritz "a lot of freedom" in his research program and did not know why Fritz retested the dichloride and original acid (T 1161–1163).

I find that the retest of the original acid and dichloride were not run in order to prove or disprove any Randall "conception."

69. On April 7, 1966, Dr. Cooke informed Amchem's patent department that the acid was biologically active and that the ester was not necessary for its biological activity (TX 276). Further tests subsequently confirmed the equality in activity between the ester and the acid (TX 359). It was also concluded that the ester was active because it hydrolized to the acid within the plant (T 468–469).

70. The decision was made within Amchem to concentrate on the development of the acid as opposed to the ester because the acid was significantly less expensive to produce (TX 276, TX 300).

d. *The Identification of the Ethylene Response*

71. During the spring and summer of 1966 testing continued on the chloroethylphosphonic compounds. At this time no one knew for certain why these compounds had such significant plant growth regulating qualities. Dr. Cooke, however, had speculated as early as December 1965 that the plants treated with the ester were manifesting an ethylene type response (T 1195–1196, 1101, 1105). Ethylene had long been known to cause desirable plant growth activity (T 315). For example, among the effects normally associated with ethylene are the control of apical dominance, ripening of fruit, induction of pineapple flowering, abscission of leaves (defoliation), and stunting, i. e., the induction of rigor in a plant to prevent lodging, i. e., the natural tendency of a plant to fall down (T 317–323, 340, see TX 792 ¶ 9).

72. The unsuccessful test for the induction of fruiting of pineapple plants which Dr. Cooke ran in Puerto Rico in February, 1966, was planned as a result of Dr. Cooke's belief that the ester was manifesting an ethylene type response. (See T 1105, see Finding 42). Despite the failure of this test, Dr. Cooke still felt during the summer of 1966 that the chloroethylphosphonic compounds caused an ethylene type response (T 1232). During that summer a Dr. R. W. Leeper visited the Amchem farm on a job interview. During the course of the interview Dr. Cooke showed Dr. Leeper a privet

hedge and told him that it had been treated with a substance which was then thought to work through the release of ethylene (T 1388).

73. In May of 1966, Dr. Cooke wrote to Tom Kirchoff of Amchem's patent department, listing the known biological activities of the ester. At the time Dr. Cooke wrote this report he knew that the ester and acid were equal in activity and any response caused by the ester would similarly be caused by the acid (TX 276, T 1088, 1091, Finding 69). The responses noted in Cooke's report to Kirchoff were defoliation, tillering of small grains, auxin activity, the induction of rooting, the control of apical dominance, increased branching, increased protein content, retardation of terminal growth, increased flowering and fruiting, the prevention of lodging, stimulation of germination, and hormone or epinastic effects (TX 292). Many of these effects are associated with ethylene (T 317–326, T 337–338, see also TX 480 and Finding 70). Thus, although the mechanism of action of the chloroethylphosphonic compounds was not known in May of 1966, many of the plant responses associated with ethylene were observed by that time (see T 351).

74. In October of 1966, Dick Hart, an Amchem employee charged with formulation of commercial batches of the acid, noted that the acid gave off significant amounts of gas during the course of neutralization (T 1093, 1423–1423). Hart informed Dr. Cooke who, in turn, brought the matter to Dr. Randall's attention at GAF (T 305, T 1092–1093). Dr. Cooke requested that Dr. Randall attempt to find out why this reaction was occurring (T 1094).

75. On November 7, 1966, Dr. Randall wrote,

It has been noticed repeatedly during the last several months that gas is evolved in [the acid] on treating with base.

It is possible that ethylene is liberated if so this might explain its hormone activity on plants as ethylene is encountered repeatedly in various metabolic pathways and is known to have certain hormone effects. (TX 387).

Dr. Randall determined that the gas evolved when the acid, reacted with base, rose to a pH [5] slightly above pH6 which is approximately the pH of a plant. Dr. Randall then collected the gas and determined it was ethylene (TX 387, T 287–288).

On November 11, Dr. Randall tested the acid for ripening of green bananas in order to prove his theory (TX 393, T 293). Dr. Randall immediately reported the fact that the acid gave off ethylene to Dr. Katz of GAF who, on November 16, 1966, communicated the information to Dr. Cooke at Amchem (T 295, TX 399). Dr. Cooke, who had also been notified earlier by Dr. Randall during a telephone conversation, thought that the ethylene response was very interesting as it confirmed his prior speculations regarding the activity of the chloroethylphosphonic compounds (T 1095).

76. After Dr. Randall determined that the acid released ethylene, Amchem began exploring the use of the acid for the ripening of fruits, a well known ethylene response (TX 408). Ripening of fruit is another manifestation of the control of apical dominance (T 322).

77. The release of ethylene from 2–chloroethylphosphonic acid was described by the Australian scientists, Judith A. Maynard and J. M. Swan. In an article written in February of 1963, they wrote:

"2–chloroethylphosphonic acid was stable to titration with 0–1n alkali at room temperature but decomposed in 30% KOH yielding ethylene. 2–chlorodecylphosphonic acid was found to decompose slowly at pH 4.5 and the rate of decomposition increased rapidly as the pH was increased, being already too fast to measure at pH7."

5. The symbol pH is a chemical representation of the relative acidity or alkalinity of a substance. pH7, on a scale of 0–14, represents a neutral substance. A pH of less than 7 represents increasing acidity while a pH greater than 7 represents increasing alkalinity (T 282–283, Webster's Third New International Dictionary at 1692).

(TX 902)

In a senior scientist report written in April 1967, Dr. Randall described the difference between his determination that the acid gave off ethylene and Maynard and Swan's determination. He wrote, "we found to the contrary [of Maynard and Swan] that [the acid] was not stable to titration with NaOH. It is rather a question of rates, ethylene being evolved slowly at a pH of 4.5 and slightly lower.... [the acid] appears to be appreciably more stable against alkaline attack." (TX 460, 750). Dr. Randall also wrote in that same report,

"It was known as early as 1939 that 1000 ppm. of ethylene in air caused early and uniform flowering in pineapples. It is predictable that within a short time after Amchem's release of literature and samples of [the acid] that plant people will suspect ethylene release as the active principle in this compound. Identification of the [acid] should be also fairly rapid."

(TX 460).

The literature which Dr. Randall referred to was an information sheet prepared by Amchem in March 1967 (TX 460 citing 451). This sheet does not list the ripening of fruit as a response (TX 451). The plant growth responses listed for the acid on this sheet were all known prior to the identification of the ethylene response (compare TX 451 with TX 292).

78. The method of applying the acid to achieve plant growth regulation was discovered well before the identification of the gas as ethylene. (See Finding 70). The identification of the gas as ethylene was essentially an explanation of that invention (T 352). Dr. Randall himself so described it [6] (TX 387, 460). The decision by Amchem to develop and seek patent protection for the use of the acid as a plant growth regulator was made well before Dr. Randall determined the identity of the gas. (See, e. g., TX 334, 353, 367, 375, 377).

### D. The Contributions of Dr. Randall

79. GAF's claims in this action are based upon what it regards as Dr. Randall's contributions to inventing the plant growth regulating use of the acid and his identification of the ethylene response. GAF owns the rights to any inventions made by Dr. Randall during his employment pursuant to an agreement executed in 1956 (TX 50).

80. Dr. Randall was a GAF senior scientist from 1965 on. This position, the highest non-managerial job in the corporation, allowed him to select his area of research (T 102–105). Although not an expert in the field of plant physiology or agronomy (T 268), Dr. Randall chose to develop a research program in the area of the synthesis of herbicides (T 1027). His choice of herbicides as his area of research was a linkage of his professional expertise in organic chemistry and his hobby as a gardener (T 102–103).

81. Dr. Randall was not involved in any way with the submission of the list 38 compounds to Amchem and his first formal exposure to the Amchem screening program was the January 4, 1966 meeting (see Finding 52, T 628–629). Like others at that meeting, he heard Dr. Cooke report on the activity of the ester in controlling apical dominance. He also heard Dr. Cooke report that both the acid and dichloride had caused defoliation activity during primary screening (T 265).

82. Around the time of the January 4th meeting, Dr. Randall was assigned the task of preparing the additional ester sample and analogs of the ester for Amchem (T 266). He began work preparing analogs of the ester at CRL in Easton, Pennsylvania, on February 6, 1966 (TX 212, T 246). On this day he worked solely on sketching out some of the possible analogs of the ester in his notebook (TX 212 at p. 209–210, T 228–230). On February 7, 1966, Dr. Randall began to make notes indicating some possible hydrolysis products of the ester (TX 212 at p. 212, T 242).

---

**6.** He wrote,

"The most significant work in this area has been our finding that [the acid] liberates *ethylene* when neutralized in aqueous or alcoholic solution. This finding explains the physiological activity of [the acid]." (emphasis in original)

TX 460.

Dr. Randall's speculation concerning the hydrolysis of the ester took place after Dr. Cooke's February 4 letter describing the reaction of the ester in water was received by Dr. Leonard at GAF's New York headquarters (*see* TX 215).

83. Dr. Randall determined that, when in water, the ester hydrolized to what is called a half or mono ester. He then speculated that, chemically, the half-ester could possibly hydrolize further to chloroethylphosphonic acid within the plant (TX 212 at 212, T 248. T 270). Immediately after this chemical speculation, he wrote:

> If the apical dominance is due to chlorethane [*sic*] phosphonic acid the catechol ester would hydrolize much easier than the aliphatic esters.
>
> (TX 212 at 212).

Dr. Randall, therefore, did not, at this time, conceive that the acid could be applied independently to the plant in order to achieve control of apical dominance. His notebook entry indicates that he still believed that an ester was essential to activity and his work on this day was merely expressing a preference for a catechol as opposed to an aliphatic ester.

84. During the month of February, Dr. Randall did not tell anyone that he thought that the acid could be applied independently of the ester to control apical dominance (*see* T 411). No reference to this concept is made in Dr. Randall's notebook, and no mention of this conception is made in Dr. Randall's March 1966 monthly highlight report wherein he describes his February work on the ester (TX 231).

85. On March 1, 1966 Dr. Katz visited Amchem where Dr. Cooke informed him, *inter alia*, of his observations concerning the instability of the ester. (Finding 61). Dr. Katz informed Dr. Randall of these discussions. On March 2, Dr. Randall, who had done no visible work in this area since February 7, began running hydrolysis experiments on the ester (T 391–393, 399, TX 234). When Dr. Katz informed Dr. Randall of Dr. Cooke's concerns regarding the stability of the ester, Dr. Randall did not mention that he believed that the acid was the active ingredient and that the ester was hydrolizing to the acid (T 395).

86. During the days of March 2 to March 9, Dr. Randall ran experiments in an effort to develop a new process for making the ester (T 1463, TX 234A). These experiments, which attempted to develop the ester through an arbusov reaction,[7] were unsuccessful (T 1463–1465).

87. At the same time that Dr. Randall was having difficulties in running the arbusov reaction he began exploring a manner of preparing the ester which required the acid as an intermediate (*see* TX 709, 827a). This was a viable although difficult method of preparing the ester (T 132, TX 313). GAF ultimately used this method in preparing a 20 pound sample of the ester (TX 313).

88. Dr. Randall was unsuccessful in synthesizing the acid as an intermediate on March 7 and March 10 (TX 237, 246). During the course of this work, Dr. Randall realized that the original acid sample sent to Amchem was not 100% acid. On March 11, 1966 he formulated what turned out to be a relatively pure sample of the acid (TX 247, T 377).

89. Sometime between March 11 and March 15 Dr. Randall telephoned Dr. Cooke, (T 401–402, 1082), and requested that Dr. Cooke grant him permission to visit Amchem in order to observe and discuss the screening program. Dr. Cooke granted permission (T 1080, *see* T 1562). Despite Dr. Randall's claims to the contrary, I credit Dr. Cooke's testimony that Dr. Randall did not mention the purity of the acid or his conception during this telephone call (T 1083).[8]

---

7. An arbrusov reaction is a method for preparing esters of phosphonic acids through the reaction of an alkyl halide and a trisphosphite ester (T 1464, Finar, I.L., I Organic Chemistry (6th ed. 1973)).

8. Dr. Randall testified at a German proceeding that he had made an earlier telephone call (T 800). I reject this testimony, however, in light of Dr. Randall's deposition testimony and Dr. Cooke's testimony which indicate that only one telephone call was made prior to March 16 (T 401–402, 1082).

Dr. Randall, however, also needed to obtain permission from Dr. Mayhew of GAF's Commercial Development Department before he could visit Amchem (T 1561). Dr. Randall informed Dr. Mayhew that he had a number of samples, including the new acid, which he wanted to deliver to Amchem. When informed by Dr. Mayhew that that was an insufficient reason for going to Amchem, Dr. Randall responded that he wanted to see how the screening program was carried out and, on that basis, Dr. Mayhew granted permission. Dr. Randall made no mention that he considered the acid the active ingredient (T 1562) or that he considered himself to be the inventor of the plant growth regulating use of the acid.

90. On March 16, 1966, Dr. Randall brought the pure acid sample, another ester sample and two analogs of the ester to Amchem (*see* Finding 65). Again, despite Dr. Randall's assertions to the contrary, I credit Dr. Cooke's testimony that he and Dr. Cooke did not discuss the question of whether the acid alone was the active ingredient (T 1085). I find that Dr. Randall's purpose in bringing the acid to Amchem was simply to correct the error which had been made when the non-pure sample had been delivered in 1965 (*see* T 1477, 1478, T 938).

91. Dr. Randall discussed his work on the ester in a senior scientist report dated March 30, 1966, at which time he still manifested his belief that the activity of the ester was due to the half-ester (TX 267). He wrote, "[a]lthough at this time the action of [the ester] on plants probably is due to the half-ester, chloroethane phosphonic acid must not be ruled out. For this reason an authentic sample of [the acid] was submitted to Amchem for testing in synergistic mixtures with catechol." (TX 267). He further wrote, "Presuming that apical dominance is not due to chloroethane phosphonic acid . . . a number of phosphonates will be prepared . . . ." (TX 276). Thus, at this time, even after he had established that the initial acid sample was impure, Dr. Randall was not claiming that the acid was the active ingredient.

92. Dr. Randall's identification in November that the acid gave off ethylene explained why the acid was an effective plant growth regulator (Finding 78).

93. Dr. Randall, over the course of his career, had over 100 inventions to his credit and was very familiar with the process by which patents on those inventions were acquired (T 1451). He also was aware of the significance of his notebook references in the invention and patent processes (T 1454). He never brought his February 7, 1966, notebook to anyone's attention prior to 1971.

94. Dr. Randall was actively involved in the formulation of GAF's patent position from 1966 on (*see* TX 470, *see, e. g.*, Findings 100–103, 106, 108). Although he inquired as to whether he could be considered an inventor of the acid in 1967, at no time prior to 1971 did Dr. Randall express a belief that he was the person who first conceived that the acid was a plant growth regulator (*see* Finding 89, T 276).

95. From the foregoing Findings which establish that Dr. Randall's notebooks contain no reference to his alleged conception, and that he told no one of any conception, and that he was acutely aware of the invention and patent processes, I find that Dr. Randall did not believe that he had made an original conception that the acid was a plant growth regulator which controlled apical dominance in February-March 1966, and I find his assertions in the years 1971 until his death, that he had such a conception in 1966 as not being worthy of belief.

E. *GAF's Acquiescence to Amchem's Filing of a Use Invention for the Acid for 1966–1971*

96. GAF's perception of its patent position under the screening agreement was set out in a memorandum from Tone to his superior Robert Gottschalk on February 21, 1966. In this memorandum Tone described the procedures whereby chemicals were offered to screeners. (*See also* Findings 12–19 *supra*.) He then described the patent positions of the respective parties under such screening arrangements. He wrote

In general there are two types of inventions which come out of these agreements; a) new compounds which are patentable as such, including isomers or homologs of knwn [sic] compounds which ordinarily are not patentable but become patentable where we can establish unique utility for them, over known isomers or homologs, in agricultural or pharmaceutical applications. The second type of invention would be any specific compositions utilizing compounds which we have submitted for screening and methods for treating plants, etc. employing these compounds. This type of application patent would be available both in the case of novel compounds which are patentable per se, and also in the case of chemicals which are not patentable per se. Under the present set up it is probable that GAF would be the inventor only in the case of compounds patentable per se. Use type of inventions would probably belong to our screeners.

(TX 225).

The rationale behind Tone's opinion was that since GAF normally submitted chemicals to screeners with no expectation of activity they made no inventive contribution to the discovery of the use. Thus, in such cases, the use invention would belong to the screener (T 971).

Gottschalk reported Tone's opinion to GAF's vice president Philip Dalton on March 1, 1966 in the course of formulating an opinion that, under the facts in the instant case, the invention of the use of the acid belonged to Amchem (TX 233). This opinion was repeated many times over the following years. (See, e. g., 340, TX 467, 642, T 698). The record indicates that the GAF patent department did not tell anyone that use inventions belonged to Amchem under all circumstances (TX 642, T 959).

Tone wrote a memorandum in July of 1969 which specifically stated the proposition that GAF could file for use patents if a GAF chemist submitted a chemical to Amchem with the belief that it would yield ethylene (TX 645). Dr. Randall responded to this memorandum on August 1, explaining some scientific misconceptions that Tone was under. Thus, although Dr. Randall testified that he was under the impression that use patents always went to Amchem, at least by July of 1969, he knew that, under some circumstances, such inventions would belong to GAF. (See TX 645, 648).

97. Amchem communicated its desire to obtain patent protection on the ester to GAF as early as March 1, 1966 (TX 237, 242, T 911). At this time GAF agreed to coordinate the activities of its patent department with Amchem's (T 911). Additionally, GAF agreed to continue work on the ester to determine its active ingredients so that Amchem could file patents on its use (TX 242).

98. In a May, 1966 semi-annual meeting, Amchem informed GAF of its plans to develop and obtain patent protection for the plant growth regulating use of the acid (TX 296).

99. On June 29, 1966, the screening agreement was amended to give GAF a right of first refusal to manufacture and furnish GAF chemicals which Amchem decided to commercialize (TX 311).

100. GAF was receiving reports on the status of the chloroethylphosphonic compounds being tested by Amchem during the summer of 1966 (see TX 327). A meeting was planned for September 8, 1966 to discuss, among other things, the patent status of these compounds and to allow both companies to collaborate in forming their patent positions through the exchange of pertinent information (TX 334, 339). Prior to this meeting Dalton requested that Gottschalk prepare "a definitive summary and appraisal of GAF's technical and patent position with respect to activities in connection with [the] screening program with Amchem." (TX 339). In response, Gottschalk wrote Dalton and informed him that Tone and Dr. Randall would prepare the requested summary (TX 33).

101. Shortly thereafter, on or around August 24, 1966, Dr. Randall and Tone met to discuss the screening program. As a result of this meeting Tone wrote that GAF would file six patent applications directed

toward previously unknown chemicals and improved manufacturing processes for the ester and its related compounds. Tone opined that use patents for the ester and the acid belonged to Amchem (TX 340).

102. In addition, a memorandum was prepared by Dr. Leonard for the September 8 meeting listing the analogs of the ester which were sent to Amchem. The acid was included as an analog in this list. Dr. Randall received a copy of the list (TX 327).

103. The September 8, 1966 meeting was attended by numerous high level managerial and technical employees of GAF, including Dr. Randall, Dr. Mayhew, Dr. Chiddix, Dr. Leonard and Tone (T 1455). Among those present from Amchem were Dr. Cooke and Tom Kirchoff of Amchem's patent department (T 929). At the meeting Amchem again informed GAF that it was going to file a patent application on the use of the acid. The GAF participants present, including Dr. Randall, raised no objection to this claim and, in fact, agreed that Amchem should "endeavor to cover the use of compounds of the ... general formula [which included the acid and various esters]." (TX 353, T 1456).

104. Throughout the remainder of 1966, even after the identification of the ethylene release, GAF continued to acquiesce in Amchem's filing of use patents on the acid. (See, e. g., TX 400, 403, 424).

105. On February 23, 1967, the original Fritz and Evans patent application for a "Growth Regulation Process Utilizing Phosphonic Compounds" was filed. (TX 444). On October 14, 1969, Dr. Cooke was added to the application as a joint-inventor on the theory that Dr. Cooke identified the ethylene response (TX 656). At trial Dr. Cooke admitted that an affidavit he executed in support of the claim contained some errors (T 1229–1230, TX 656).

106. On March 10, 1967, Dr. Randall filed a patent proposal within GAF for a "new Process for Production of Ethylene from Beta-chloro-ethyl Phosphonic Acid." Tone and another GAF patent attorney reviewed Dr. Randall's claim in detail and concluded that it was not patentable be-

cause the concept that the neutralization of the acid would yield ethylene was predicted by Maynard and Swan (TX 468, see Finding 77, TX 902). Further, Tone felt it was unpatentable because "at most it is merely an explanation of how [the acid] and its esters, etc., operate in the process of Amchem Case 642 [the acid use case], i. e., by the generation of ethylene which is the actual plant growth regulating material." (TX 468).

107. On May 12, 1967, there was a meeting at Amchem concerning the chloroethylphosphonic compounds. At some point during that day Dr. Randall told Tone about the work he had done on the acid and inquired whether he possibly could be considered an inventor of the acid's use. (T 934, T 274). This was the first time that Dr. Randall had ever inquired as to the possibility that he might have been an inventor of the use of the acid. (See T 1453, 1458, 1475–1476). Tone did not look at the Randall notebook of February 7 (T 981).

Tone believed that a GAF employee could be a use inventor if he had submitted a chemical looking for confirmation of an expected response (T 938, 972). After listening to Dr. Randall's story, however, Tone concluded that Randall did not submit the acid in the belief that it would work, but rather had corrected a mistake which GAF had made initially by sending Amchem an impure sample initially (T 938). I find that Dr. Randall did not claim in this conversation that when he made the pure acid sample in March of 1966 he believed it was the active ingredient (T 936).

108. On May 19, 1967, Tone wrote a memorandum to Dr. Katz stating that GAF had filed all the patent applications which it was able to file at that time (TX 470). On August 3, 1967, Dr. Randall filed a memorandum conveying the same conclusion (TX 477).

109. On November 10, 1967, Amchem informed GAF of the foreign countries wherein it was filing use patents for the acid (TX 498). Subsequently, on July 12, 1968, Amchem provided GAF with the seri-

al numbers and filing dates relating to its foreign applications (TX 596).

110. The foregoing Findings of Fact establish that GAF acquiesced in Amchem's filing of use patents on the acid (*see, also,* TX 400, 468, 477) after GAF had made investigation of and given careful consideration to its patent position. (*See, e. g.,* 223, 225, 339, 403, 468, 477).

111. During the period of 1966–1971 neither Dr. Cooke nor anyone else at Amchem was informed that Dr. Randall had conceived the idea that the acid was an active plant growth regulator in February and March of 1966. (*See, e. g.,* Findings 80, 85, 86, 89–102).

112. The first time that anyone at Amchem had any knowledge that GAF intended to claim that Dr. Randall conceived that the acid was a plant growth regulator was in January of 1971 when Dalton so informed Amchem executives (T 684–85).

113. During the years 1966–1971, Amchem spent approximately $2,000,000 in the research and development of the acid (T 1571). The money was spent on, among other things, secondary screening programs; chemical synthesis, formulation and quality control work; residue metabolism studies, toxicology and other environmental impact evaluations, label registration activities, domestic and international patent filings and prosecutions and market evaluations.

114. Amchem would not have made the substantial development expenditures on the acid if it had not had a proprietary position over it, *i. e.,* a patent or an exclusive license (T 1568, 1584–85).

F. *The Decision to Bring the Lawsuits*

115. During the years leading up to the initiation of this action there was a feeling among some at GAF that GAF's total contributions to the screening program were not being adequately rewarded under the screening agreement (T 693, TX 668).

116. On January 9, 1969, Amchem gave GAF formal notice that it was going to commercialize the acid as a plant growth regulator and that it would negotiate with GAF for commercial supply of the chemical (TX 609).

117. During the remainder of 1969 and 1970, GAF continuously re-evaluated its patent rights in relation to the chloroethylphosphonic compounds (TX 622, 633, 637, 638, 640, 642, 643, 688). This re-evaluation was motivated, in part, by the fact that GAF's bargaining strength in negotiating the supply agreement with Amchem was directly affected by GAF's patent position in relation to the compound (T 690, *see* TX 668, 680, 692).

118. In February of 1970, Dalton once again requested that GAF's patent position be re-evaluated before he discussed the matter of price in the supply negotiations (TX 680, 682). In response, Mr. S. B. Leavitt, a GAF patent attorney, set forth a summary of GAF's position which made no claim to the invention of the acid's plant growth regulating use (TX 683).

119. On December 31, 1969, Tone retired from GAF (T 888). In May of 1970, Walter Kehm replaced Gottschalk as director of patents at GAF (T 483). Gottschalk left GAF to become the United States Commissioner of Patents (T 647).

120. In the late summer or early fall of 1970, Kehm was requested to look into the matter of GAF's screening agreements, in particular the GAF-Amchem relationship (T 484, 678). Kehm was told to examine the Gottschalk opinions regarding the ownership of the invention of the acid's use (*see* TX 233, 643), and was then requested to render his own opinion (T 678, 689). Kehm was aware of the supply negotiations being conducted at this time (T 641–642, TX 715).

121. Kehm assigned Leavitt the task of investigating who owned the invention of the acid's use (T 487). At the same time, Kehm requested Martin Levitin, another GAF patent attorney, to submit a memorandum discussing the screening agreement in general, and to come up with imaginative solutions regarding GAF's inability to attain a favorable position in the supply negotiations (T 1489, 1492).

122. On November 20, 1970, Leavitt submitted his memorandum to Kehm. Leavitt,

after speaking to Copes and Dr. Randall, reported to Kehm that Dr. Randall and possibly Copes were the first to conceive that the acid could be used as a plant growth regulator and, under the patent laws, should be considered the inventors (TX 709).

123. On November 27, 1970, Levitin submitted his memorandum. He incorporated the conclusions of Leavitt's memorandum and recommended the following suggestions on how to strengthen GAF's position in the supply negotiations.

a. An application for patent can be filed naming a GAF employee as the inventor of the basic use patent of [the acid] as a plant growth regulator. Ample facts and precedent are available to provide reasonable support for this contention.

b. Amchem has license rights, but GAF can quote the terms it considers reasonable (if Amchem does not request an exclusive license by July, 1971, it is only entitled to a nonexclusive license; GAF could also grant some third party intervening exclusive rights).

c. Amchem's "good faith" relative to GAF's right of first refusal to supply could be questioned. The license to Amchem may be considered in part dependent upon such negotiations in good faith. Both the right of first refusal to supply and the license rights are stated to be granted in consideration of the contributions made by the parties under the agreement.

d. Amchem's conduct should be scrutinized closely for possible breaches of confidence. A violation of the confidentiality provisions of the agreement, such as by screening outside the Field, disclosing the structure to obtain price quotations etc. might be actionable and provide a claim for damages sustained by GAF of sufficient magnitude to require Amchem to settle upon favorable terms.
TX 711.

124. Kehm then submitted a memorandum to Dalton which concluded that Dr. Randall and Joseph Copes were the inventors of the use of the acid (TX 715). Kehm based his opinion on his knowledge of the facts and his interpretation of three patent cases concerning the issue of the originality of invention between those who submitted chemicals and those who screened them (TX 715), citing *MacMillan v. Moffett,* 432 F.2d 1237 (CCPA 1970); *Applegate v. Scherer,* 332 F.2d 571 (CCPA 1964); *Howell & King v. Taborsky,* 164 U.S.P.Q. 58 (Bd. of Patent Interferences 1969).

125. At the time Kehm wrote his opinion he was under the impression that Dr. Randall or Copes had compiled list 38 in 1965 and had predicted that the compounds therein could be used as plant growth regulators and herbicides (TX 715). At trial Kehm admitted that Randall had absolutely no involvement with the submission of list 38 (T 628-629). Further, it is clear that Copes was unable to predict the activity of any compound he submitted (Finding 16).

126. The cases cited by Kehm in his opinion do not support the proposition that a use invention belongs to one who submits a chemical to a screener without a conception of possible activity. *See Lazo v. Tso,* 480 F.2d 908, 910 (CCPA 1973). Kehm, however, testified that he believed those cases could support such a proposition (T 628c).

127. At the time Kehm submitted his opinion, Tone was working parttime at GAF. Although Tone was available for consultation, Kehm at no time discussed the matter of the invention of the acid's use with Tone nor did he read any of Tone's opinions on the matter prior to rendering his own opinion (T 530-31, T 902).

128. Upon receipt of the Kehm opinion, Dalton directed Kehm to get an outside opinion (T 626a). Kehm selected the New York law firm of Fish & Neave, which, on January 22, 1971, after consideration of Kehm's memorandum, various documents and an interview with Randall and Copes, agreed with Kehm (TX 726).

129. On January 22, 1971, Dalton went to Amchem and informed it of GAF's claim to the invention. Amchem vigorously denied GAF's claim (*See* T 685). The parties

were unable to come to an amicable resolution of their differences and, ultimately, these lawsuits and various foreign actions were filed.

## II.  DISCUSSION

### A.  *The Applicable Law and the Burden of Proof*

#### a.  *The Applicable Law*

The primary purpose of this phase of the trial is to determine whether Dr. Randall was a sole or joint inventor of the use of the acid as a plant growth regulator which is a crucial issue in both GAF's 1972 and 1975 lawsuits.  Also to be tried are Amchem's affirmative defenses in the 1972 action of laches and equitable estoppel.  It should be noted, however, that the 1972 and 1975 actions are distinct lawsuits.  The 1972 lawsuit is a diversity action which seeks to have Amchem declared a constructive trustee for all foreign patents and pending foreign patent applications which embody the inventions allegedly made by Dr. Randall. The theory behind GAF's claim is that Amchem misappropriated Dr. Randall's invention by using it as a basis for its patent applications.  One count of the 1975 complaint seeks similar relief in relation to Amchem's '188 United States Patent.  The thrust of the 1975 action, however, is GAF's attempt to secure a declaration of the U.S. '188 patent's invalidity.  The 1975 action also contains allegations that Amchem committed antitrust violations.  This trial does not concern the 1975 action except to the limited extent that GAF's claims in that action are predicated on its contention that Dr. Randall invented the plant growth regulating use of the acid.

Insofar as both of these actions seek equitable relief (the 1972 action in its entirety and the 1975 action in part) for Amchem's alleged misappropriation of Dr. Randall's invention, the parties agree that Pennsylvania law is applicable.  *See GAF Corporation v. Amchem Products, Inc.,* 570 F.2d 457 (3d Cir. 1978).  *See also Becher v. Contoure Laboratories,* 279 U.S. 388, 391, 49 S.Ct. 356, 357, 73 L.Ed. 752 (1929).  However, the 1975 declaratory judgment action is brought under the federal patent laws and, accordingly as to the claims in that action seeking to invalidate Amchem's '188 patent, federal law is controlling.  6A Moore, Federal Practice, ¶ 57.20 at 57–206 [2d ed. 1980].

Although GAF's claims for equitable relief are controlled by Pennsylvania law, its theory of the case requires that federal law be incorporated to a limited extent.  It claims that under the United States Patent Laws, 35 U.S.C. § 1 *et seq.,* Dr. Randall was either a sole or joint inventor of the plant growth regulating use of the acid.  Accordingly, the classification of Dr. Randall's contribution—whether he was an inventor—must be decided by reference to the Patent Laws of the United States for the purposes of both the 1972 and 1975 actions.  *Cf. Jamesbury Corporation v. Worcester Valve Company,* 318 F.Supp. 1, 6 (D.Mass.), *aff'd,* 443 F.2d 205 (1st Cir. 1970).  *See generally* Cooper, State Law of Patent Exploitation, 56 Minn.L.Rev. 313, 366 (1972).

#### b.  *Burden of Proof*

■ The parties are in complete disagreement as to which standard is applicable to GAF's burden of proof on the issue of inventorship.  Amchem contends that GAF must establish Dr. Randall's inventorship by clear and convincing proof, whereas GAF contends that it need do so only by the preponderance of the evidence.  This disagreement may stem, in part, from the fact that the resolution of Dr. Randall's claims to inventorship has significant impact in two distinct lawsuits in which the applicable rules of decision are found in two distinct bodies of law.  Insofar as GAF seeks the imposition of a constructive trust, Pennsylvania law clearly requires that it must prove each fact upon which it relies by clear and convincing evidence.  *Truver v. Kennedy,* 425 Pa. 294, 307, 229 A.2d 468 (1967); *Butler v. Butler,* 464 Pa. 522, 347 A.2d 477, 481 (Pa.1975) (Pomeroy, J., concurring). *See Gilberti v. Coraopolis Trust Co.,* 342 Pa.

161, 162, 19 A.2d 408 (1941).[9] Since proof of Dr. Randall's inventorship is a prerequisite to GAF's claim to a constructive trust in both the 1972 and 1975 actions, GAF must, therefore, establish that fact by clear and convincing evidence.

In the 1975 action seeking a declaration of the patent's invalidity, the issue of GAF's burden of proof is not as clear cut. GAF contends that the patent is invalid pursuant to 35 U.S.C. § 102(a), (f) and (g).[10] Insofar as this phase of the trial is concerned the factual allegations underlying all of these asserted grounds of invalidity are that Dr. Randall invented the plant growth regulating use of the acid and that Amchem derived its U.S. patent from Randall's invention. "A patent shall be presumed valid. . . . The burden of establishing invalidity of a patent or any claim thereof shall rest on a party asserting it." 35 U.S.C. § 282; *Trio Process Corporation v. L. Goldstein's Sons, Inc.*, 461 F.2d 66, 70 (3d Cir.), *cert. denied*, 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262 (1972). This presumption of validity also encompasses the named inventors in a patent. *Amax Fly Ash Corporation v. United States*, 514 F.2d 1041, 1047 (Ct.Cl.1975); *Acme Highway Products Corporation v. D.S. Brown Co.*, 431 F.2d 1074, 1083 (6th Cir. 1970), *cert. denied*, 401 U.S. 956, 91 S.Ct. 977, 28 L.Ed.2d 239 (1971); *Johnson & Johnson v. W.L. Gore & Associates, Inc.*, 436 F.Supp. 704, 711 (D.Del.1977); *Congoleum Industries, Inc. v. Armstrong*

*Cork Company*, 339 F.Supp. 1036, 1054 (E.D. Pa.1972). *See Mueller Brass Co. v. Reading Industries, Inc.*, 352 F.Supp. 1357, 1373 (E.D.Pa.1972).

The statute itself gives little guidance as to the quantum of proof necessary to establish the invalidity of a patent. The Third Circuit, however, has stated that "the party challenging the validity of a patent bears a heavy burden of demonstrating by clear and convincing proof a prior use or sale of the patented invention or *the patent's deficiency in some other respect.*" *Paeco, Inc. v. Applied Moldings, Inc.*, 562 F.2d 870, 872 (3d Cir. 1977) (emphasis supplied). The *Paeco* court reiterated the heavy burden faced by one who seeks to establish a patent's invalidity at another point in the opinion stating "in order to invalidate a patent on grounds of anticipation, *as on any other ground of invalidity*, the party asserting the invalidity bears a heavy burden of demonstrating it by clear and convincing proof." *Id.* at 875 (emphasis supplied).

Reflecting the scrutiny with which courts have historically viewed claims of prior inventorship, see, e. g., *Eibel Process Co. v. Minnesota & Ontario Paper Co.*, 261 U.S. 45, 60, 43 S.Ct. 322, 327, 67 L.Ed. 523 (1923); *The Barbed Wire Patent*, 143 U.S. 275, 285, 12 S.Ct. 443, 447, 36 L.Ed. 154 (1892), the courts have uniformly required that claims of prior inventorship and derivation be established by clear and convincing evidence. See, e. g., *Amax Fly Ash Corporation v.*

---

9. Plaintiff argues that the burden of proving its case by clear and convincing proof should not be placed on a plaintiff who seeks the imposition of a constructive trust based on a theory of breach of confidential relationship. V Scott on Trusts § 462.6 at 3423 (3d ed. 1967 & Supp. 1981). Regardless of the validity of Professor Scott's criticism of the rule requiring the application of the clear and convincing proof standard in such cases, I am bound in this diversity action to apply Pennsylvania law on the question of the burden of proof. *Cities Service Oil v. Dunlap*, 308 U.S. 208, 212, 60 S.Ct. 201, 203, 84 L.Ed. 196 (1939); 10 Moore's, Federal Practice, § 302.02 [2d ed. 1979 & Supp.] Although criticising the rule, the Scott treatise recognizes Pennsylvania as one of the jurisdictions that requires proof of facts underlying a claim for a constructive trust by clear and convincing evidence. V Scott, *supra*, § 462 & n.1. Plaintiff

has not cited any Pennsylvania law which indicates that a preponderance of the evidence standard applies in such cases and in fact, the Pennsylvania Supreme Court has never overruled the cases establishing the clear and convincing proof requirement.

10. 35 U.S.C. § 102 provides in pertinent part:

"A person shall be entitled to patent unless—
(a) the invention was known or used by others in this country, . . . before the invention thereof by the applicant for patent, or

\* \* \* \* \* \*

(f) he did not himself invent the subject matter to be patented, or
(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. . . ."

*United States*, 514 F.2d 1041, 1047 (Ct.Cl. 1975); *Campbell v. Spectrum Automation Company*, 513 F.2d 932, 937 (6th Cir. 1975); *Johnson & Johnson v. W.L. Gore & Associates, Inc.*, 463 F.Supp. 704, 711 (D.Del.1972); *Congoleum Industries, Inc. v. Armstrong Cork Company*, 339 F.Supp. 1036, 1054 (E.D. Pa.1972). *See Egnot v. Looker*, 387 F.2d 680, 683 (CCPA 1967) (application of beyond a reasonable doubt standard).

The rationale for the imposition of a strict standard of proof in such cases stems only partly from the patent's presumption of validity. More important is the fact that proof of prior inventorship and derivation often focuses on the state of mind of a claimant years prior to trial, a fact which makes such claims inherently suspect. *See Dickstein v. Seventy Corporation*, 522 F.2d 1294, 1297 (6th Cir. 1975); *Amax Fly Ash Corporation v. United States*, 514 F.2d 1041, 1047 (Ct.Cl.1975); *Campbell v. Spectrum Automation Company*, 513 F.2d 932, 937 (6th Cir. 1975).

In *Dickstein, supra*, the court held that the preponderance of the evidence standard was applicable in a case where the asserted ground of invalidity was that the invention was obvious. *See* 35 U.S.C. § 103.[11] The court so held because generally the proof submitted in such cases is essentially documentary, *i. e.*, published prior art. The *Dickstein* court stated, however, that the clear and convincing standard should be applied

> "when unusual factual circumstances, by their very nature, require it. Certain testimony may be inherently suspect, as for example, where oral testimony is offered to prove that the person to whom the patent was issued was not the inventor, or where oral testimony is offered to establish prior public use ... or where there are allegations of fraudulent conduct.... The strict standard of proof in these cases is justified because of the unreliability of hazy and biased recollections of stale facts and circumstances,

peculiarly within the knowledge of the testifying parties. These allegations are easy to assert and difficult to rebut. Their character requires a strict standard of proof."
> *Id.* at 1297.

Similar thoughts are found in *Amax Fly Ash Corporation v. United States*, 514 F.2d 1041, 1047 (Ct.Cl.1975), wherein the court held that a party seeking to establish prior conception and derivation must do so through clear and convincing evidence. The court stated

> "[S]ince conception is an act of the mind, ... the temptation for even honest witnesses to reconstruct, in a manner favorable to their own position what their state of mind may have been years earlier, is simply too great to permit a lower standard."
> *Id.* (citations omitted).

The instant case also is the type of case which calls for the imposition of the higher standard of proof. GAF claims a prior conception on the part of Dr. Randall. Much of the evidence necessary to sustain that claim consists of oral assertions by Dr. Randall. The primary documentary evidence in support of the claim is an ambiguous notebook entry, the meaning of which depends on the interpretation given to it by Dr. Randall. *See Campbell v. Spectrum Automation*, 513 F.2d at 932. Further, GAF has asserted that Amchem derived and misappropriated its patent protection through a breach of confidential relations. This sounds in fraud, and as the court in *Dickstein* pointed out, such claims should be sustained by clear and convincing proof.

The cases cited by GAF in support of its contention that the preponderance of the evidence standard applies in cases such as the instant case do not consider the evidentiary rationale underlying the application of the more stringent burden of proof. These cases, in fact, do not consider, at all, the quantum of proof by which claims of prior inventorship and derivation must be estab-

---

**11.** It should be noted that the Third Circuit does not adhere to this view as it generally requires clear and convincing proof regardless of the asserted ground of invalidity. *See Paeco, Inc. v. Applied Moldings, Inc., supra*, 562 F.2d at 872 & 875.

lished. *See, e. g., Phillips Electronic and Pharmaceutical Industries, Inc. v. Thermal and Electronics Industries, Inc.,* 450 F.2d 1164, 1176 (3d Cir. 1971); *Shelco, Inc. v. Dow Chemical Company,* 322 F.Supp. 485, 517 (N.D.Ill.1970); *The Ansul Company v. Uniroyal, Inc.,* 301 F.Supp. 273, 280 (S.D.N.Y.1969), *aff'd,* 448 F.2d 872 (2d Cir. 1971), *cert. denied,* 404 U.S. 1018, 92 S.Ct. 680, 30 L.Ed.2d 666 (1972); *Marshall v. Procter & Gamble Manufacturing Co.,* 210 F.Supp. 619, 632–33 (D.Md.1962); *Shreckhise v. Ritchie,* 67 F.Supp. 926, 932–33 (W.D.Va.1946), *aff'd,* 160 F.2d 593 (4th Cir. 1947).

*Phillips Electronic, supra,* and *Shelco Inc., supra,* are clearly inapposite as the courts in those cases considered the strength of the presumption of validity where the asserted ground of invalidity was that the invention was obvious, and the patent office did not consider prior art. Plaintiff's bootstrap argument that Amchem's failure to disclose Dr. Randall's contribution to the patent office was a failure to cite prior art is not persuasive.

Somewhat more persuasive, however, is plaintiff's argument that GAF should not be held to a more stringent burden of proof because Dr. Cooke made certain misrepresentations to the patent office concerning his role in the discovery of the ethylene response theory (Finding 105). There is case law which holds that the presumption of validity is weakened or destroyed in the face of such evidence. *See, e. g., The Ansul Company v. Uniroyal, supra,* 301 F.Supp. at 280. The significance of this holding is lessened by the fact that in the instant case the stricter standard is not mandated by the presumption of validity but rather by the proof problems inherent in claims of prior inventorship and derivation. Accordingly, I am not persuaded that GAF need prove Dr. Randall's inventorship by the preponderance of evidence standard in this trial insofar as the resolution of that issue relates to the 1975 action. Therefore, GAF also must prove Dr. Randall's inventorship by clear

and convincing evidence in the 1975 action as well as in the 1972 action.

The above discussion is, however, somewhat academic. As I will discuss *infra,* even if the preponderance of the evidence standard is applicable in this trial, GAF has not even met its burden under that lesser standard of establishing that Dr. Randall was an inventor of the use of the acid as a plant growth regulator.

B. *GAF's Claim that Dr. Randall Invented the Plant Growth Regulating Use of the Acid*

The starting point in any case claiming the misappropriation of an invention is, of course, whether there has been an invention. *See Van Products Company v. General Welding and Fabricating Company,* 419 Pa. 248, 268, 213 A.2d 769 (1965).

Inventing is comprised of the conception of an idea and its reduction to practice. *Rex Chainbelt, Inc. v. Borg-Warner Corporation,* 477 F.2d 481, 487 (7th Cir. 1973); *Jamesbury Corporation v. Worcester Valve Company, supra,* 318 F.Supp. at 7.[12] In the instant case GAF claims that Dr. Randall conceived the use of the acid as a plant growth regulator on February 7, 1966, and that Amchem merely reduced Randall's conception to practice through its routine tests in March and April of that year. GAF further alleges that Amchem misappropriated the invention and derived its patent position from Dr. Randall's conception and that, therefore, Amchem is not entitled to any patent protection. *See generally* 35 U.S.C. § 102. This claim is essentially one of prior conception and derivation of an invention. Such claims require corroboration, the existence of which "is to be determined by viewing the evidence as a whole." *Amax Fly Ash Corporation v. United States, supra,* 514 F.2d at 1047 (citations omitted). *See Bell Telephone Laboratories, Incorporated v. Hughes Aircraft Company,* 564 F.2d 654, 657 (3d Cir. 1977) (testimony

**12.** There is no dispute in this case that the discovery of the use of the acid as a plant growth regulator was a patentable invention.

See 35 U.S.C. §§ 101, 103. The sole issue is who discovered the use.

of an inventor on essential issues of priority must be corroborated).[13]

■ The notion that there must be a conception before there is an invention is fundamental in the patent law. *Technitrol, Inc. v. United States*, 440 F.2d 1362, 1369 (Ct.Cl.1971). GAF is correct, however, in stating that the conceiver need not be the one who reduces his conception to practice in order to be considered the inventor. *MacMillan v. Moffett*, 432 F.2d 1237, 1240 (CCPA 1970); *Applegate v. Scherer*, 332 F.2d 571, 573 (CCPA 1964).

Conception has been defined as:

"the formation in the mind of a definite idea of a complete and operative invention as it is thereafter to be reduced to practice.... The date of conception is the date when the inventive idea is crystallized in all its essential attributes and becomes so clearly defined in the mind of the inventor as to be capable of being converted to reality and reduced to practice by the inventor or by one skilled in the art."

*Technitrol, Inc. v. United States, supra*, 440 F.2d at 1369, quoting 1 Walker, Patents, § 45, Deller's 2d ed. at 191–92. *See also Ritter v. Rohm & Haas Company*, 271 F.Supp. 313, 319 (S.D.N.Y.1967). An analysis of the facts in this case fails to establish that Dr. Randall conceived that the acid was a plant growth regulator in February of 1966.

### a. The February 7 Notebook and Randall's Behavior in February and March of 1966

GAF relies primarily on Dr. Randall's notebook entries of February 7, 1966 for corroboration of its claim that Dr. Randall had a conception of the plant growth regulating use of the acid. Authenticated notebooks can provide corroboration for a claim of conception. *Ritter v. Rohm & Haas, supra*,

271 F.Supp. at 320–21. Randall's notebook entries of February 7, do not, however, corroborate his claims. These entries actually manifest a continuing belief by Randall that an ester was essential to the plant growth activity which had been observed by Amchem. Nowhere on the February 7 notebook pages is there any indication that Dr. Randall had the idea that the acid could be applied independently to achieve plant growth regulation. His writings that day consisted of theoretical chemical speculation of the route which hydrolysis of the ester could possibly take (Finding 79), and did not manifest the formation in Dr. Randall's mind of a complete invention. *Cf. Roensch v. Billner*, 212 F.2d 193, 196 (CCPA 1954).

Dr. Randall's actions subsequent to February 7 also fail to corroborate his claims that he conceived the use of the acid on that date. Dr. Randall had been present at the January 4 meeting and was aware of the excitement generated by the discovery of the ester's activity (Findings 48, 52, 79), yet after his alleged discovery on February 7, he failed to inform anyone at Amchem or GAF that, in his view, the acid should be retested because it was the reason that the ester was active. Dr. Randall did not even mention his alleged conception in his monthly highlight report for February (Finding 84).

Dr. Randall testified [14] that he told no one of his conception because he first wanted to have proof of his theory, (*see* T 411–415), but his actions after his February 7, 1966, work do not persuade me that this is what in fact occurred. Dr. Randall's lack of visible work on the chloroethylphosphonic compounds during the month of February belies his contention that he remained silent because he desired to prove this theory. In my view, if Dr. Randall had indeed conceived the theory regarding the acid's activity he would have moved promptly to syn-

---

**13.** As the court noted in *Bell*, "the function of the corroborating evidence is to assist the factfinder in deciding whether the inventor's testimony is credible, the question whether its amount and quality is adequate for that purpose is peculiarly for the factfinder to pass

upon in the light of the circumstances of the case." 564 F.2d at 657 (citations omitted).

**14.** Since Dr. Randall had died before trial, his testimony consisted of portions of depositions which were read into the record.

thesize the acid after his conception. Dr. Randall's failure to do any follow up work on the acid in February is especially suspect when contrasted to his behavior in November, when shortly after he found that the acid released ethylene he applied the acid on green bananas to see if they would ripen.

GAF contends that Dr. Randall decided to synthesize a new acid sample as a result of his "conception." The facts, however, persuade me otherwise. When Dr. Randall resumed his work on the chloroethylphosphonic compounds in early March it was because Dr. Katz requested that he examine the instability of the ester in water, an observation made by Dr. Cooke. Pursuant to that request, Dr. Randall ran some hydrolysis experiments with the ester. When he explained the reason for the ester's instability, he still did not mention that the acid was active (Finding 85). Then, instead of doing anything to determine whether his "conception" was correct [a finding which would have made further work on the ester unnecessary, (see Finding 69)] Dr. Randall undertook to synthesize an additional sample of the ester (Finding 86). It was in the course of doing so that he formulated the pure acid sample (Findings 87 and 88). If Dr. Randall had actually conceived that the acid was an active plant growth regulator, and that the original acid sample had been impure, and that the ester was nonessential to the acid's activity, I do not believe that he would have attempted to first synthesize the ester instead of formulating the acid. Proof of his theory would have made further work with the ester unnecessary (see Finding 69). After hearing Dr. Randall's deposition testimony and listening to testimony of others concerning him, it is my impression that Dr. Randall was not one to do unnecessary acts. Dr. Randall's testimony that he prepared the acid in response to his conception is simply not credible. I believe, instead, that Dr. Randall prepared the acid as an intermediate in the synthesis of the ester (Findings 86–88). Indeed, this is the explanation given by Leavitt in his memorandum to Kehm in 1971 (TX 709).

Dr. Randall's actions after he discovered that the original acid was impure also fail to corroborate GAF's contention that he had made the claimed conception. Dr. Randall did not discuss his alleged conception with anyone. Despite his assertions to the contrary, I do not believe that he told Dr. Cooke either at the time he telephoned for permission to go to Amchem or when he got there, that he believed that the acid was active (Findings 89, 90). Nor did he inform Dr. Mayhew of his own company that he thought he had the active ingredient when he sought permission from Dr. Mayhew to visit the Amchem laboratory (Finding 89). A further indication of Dr. Randall's lack of conception is found in his senior scientist report for March which was written after the submission of the pure acid sample. In this report Dr. Randall asserted that the half ester was most likely the active component (Finding 91).

Dr. Randall, in February-March of 1966, simply did not do what a person who had conceived that the acid was an independent plant growth regulator would have done. Dr. Randall's notebooks fail to spell out his claimed discovery, and his lack of contemporaneous discussion or assertions concerning his alleged conception casts a serious doubt on the credibility of his belated claim. *Cf. Amax Fly Ash Corporation, supra,* 514 F.2d at 1047 (since conception is a state of mind the temptation for even honest witnesses to favorably reconstruct events is great).

### b. *Dr. Randall's 1967 Discussion with George Tone*

A careful analysis of the remainder of the record also refutes Dr. Randall's claim of conception. As above noted, Dr. Randall simply did not act like a person who believed that he had conceived an invention. He was an active participant in the formulation of GAF's patent position regarding the acid and related compounds, (Finding 94), yet the only time prior to 1971 when he discussed the patent implications of his February-March work was in May 1967 when he discussed the subject with George Tone (Finding 107).

GAF has attempted to portray George Tone as the villain in this case by claiming

that he gave short shrift to Randall's claims of inventorship and that Tone made crucial mistakes of law and fact. I simply do not accept that characterization of Tone. I am satisfied that Tone acted under no mistakes of law or fact. Tone was fully aware that, if a GAF employee submitted a chemical with the conception that a certain response could or should occur, that GAF employee would be entitled to the use invention of that chemical (Finding 96). This is the correct interpretation of the *MacMillan v. Moffett* and *Applegate v. Scherer* line of cases. *See Lazo v. Tso*, 480 F.2d 908, 910 (CCPA 1973). To me it is significant, therefore, that when Dr. Randall informed Tone of his work, Tone, who correctly interpreted the law, advised Dr. Randall that all he had done was to correct the error made when the impure sample was submitted (Finding 107).

GAF contends that Tone lacked crucial information and therefore acted under a mistake of fact because he had failed to analyze Dr. Randall's February 7 notebooks. A more plausible inference to be drawn from Tone's failure to look at the notebooks is that Dr. Randall failed to bring the notebooks to Tone's attention because Randall did not, at that time, believe that the notebooks recorded a conception. Dr. Randall was an experienced inventor, being the named inventor on over 100 patents, and he knew how important his notebooks were in the patent process (Finding 93). If he had believed that his February 7 notebook entry reflected the conception that the acid was an active plant growth regulator, it is inconceivable to me that he would not have brought them to Tone's attention.

Dr. Randall's failure to mention facts to Tone which would indicate that he had a conception of the acid's activity, and his failure to make such a claim for a period of approximately five years, convinces me that Dr. Randall did not, in fact, have such a conception. Dr. Randall's silence cannot be explained away, as GAF attempts to do, by

claiming that he believed that use inventions belonged to Amchem.[15] By, at the very latest, July of 1969, Dr. Randall knew that GAF was entitled to use inventions if it submitted a chemical with expectation of activity (Finding 96). Even if he believed otherwise prior to July 1969, there is nothing in the record to explain his continuing silence from that date until 1971. The record reveals clearly that Dr. Randall was very patent-conscious (Finding 93). I am convinced that if Dr. Randall had believed that he had conceived the plant growth regulating use of the acid he would have proclaimed his discovery to GAF and to Amchem personnel.

c. *Activity at Amchem in 1966*

1. *The Delivery of the Acid by Dr. Randall*

GAF does not solely rely on the actions of Dr. Randall and those at GAF to corroborate Randall's claim of conception, it argues also that the conduct of Amchem personnel supports its position. GAF contends that Amchem had dropped the acid in December of 1965 and that Amchem only retested it because Dr. Randall had convinced Dr. Cooke that the original sample was impure and that the new sample might be active.

I am not persuaded that this is in fact what occurred. It is true that Amchem dropped the acid as a prospective defoliant in December of 1965 (Finding 47), but Amchem maintained a continuing interest in the acid as it related to the activity of the ester (Findings 45, 47). This continuing interest was communicated to GAF representatives at the January 4 meeting when the question of the acid's purity was raised (Finding 51).

Whether the acid's purity was discussed at the January 4 meeting has been the subject of much dispute in this case. The GAF representatives uniformly testified that they had no recollection of any such discussions. Dr. Cooke testified that the

**15.** It is not Dr. Randall's failure to recognize the legal significance of his work that convinces me that he did not have a conception, rather it was his failure to draw attention to the scientific value of his work that convinces me that he did not have the idea that the acid was an active plant growth regulator.

subject was discussed. I accept as credible his testimony that upon his return to Amchem following that meeting, Dr. Cooke told both Fritz and Mrs. Gallagher that there was a possibility that the acid was impure. Mrs. Gallagher and Fritz testified that they made notations on the screening card and on the acid sample bottle (Finding 53). GAF contends that Fritz and Mrs. Gallagher were not truthful, but I found their testimony to be credible and accurate. I have found that they did note the acid's possible impurity after the January 4 meeting, and from that I infer that the subject was discussed at the meeting.

I do not, however, rely solely on the January 4 meeting in determining that Amchem had a continuing interest in the acid and did not need to be convinced to retest it. Dr. Mayhew, a GAF employee, testified that on March 4, 1966, Dr. Cooke discussed the ambiguity between the activity of the ester and the acid and speculated regarding the acid's purity (Finding 62). Although I reject Dr. Randall's assertion that he discussed the activity of the acid with Dr. Cooke in March (Findings 89, 90), even if I had accepted Dr. Randall's testimony as accurate, his alleged conversation occurred after he had synthesized the pure acid sample, i. e., after March 11 (Finding 89 & n.7, T 401–402), some days after Dr. Cooke had discussed the same issue with Dr. Mayhew. Accordingly, I cannot accept as credible Dr. Randall's testimony that he had to convince Dr. Cooke to retest the acid when Dr. Randall delivered the new sample on March 16. Neither the events of that day nor Amchem's pre-March 16 behavior corroborate the Randall "conception" claim.

2. *The post delivery testing by Amchem*

GAF also contends that Amchem's testing after the acid was delivered in March is circumstantial proof that Dr. Randall had a conception that the acid would be an effective plant growth regulator. For example, GAF claims that Fritz retested the dichloride in water with the knowledge that it would hydrolyze to the acid, and that he made that test in order to prove or disprove Dr. Randall's conception. The facts do not

support GAF's argument. Fritz, with a limited chemical background, did not know that the dichloride hydrolyzed to the acid. Further, I found Fritz to be a credible witness and can find no reason to disbelieve his testimony that he tested the dichloride because he believed it was an analog of the ester. Dr. Cooke knew that the dichloride hydrolyzed to the acid, but he did not communicate that fact to Fritz (Finding 68).

Although Dr. Cooke told Fritz that the dichloride should be retested as an analog, I am not persuaded that Dr. Cooke ordered the retest because he wanted to test the alleged Randall conception. First, Fritz testified that he was simply told that the dichloride should be included in any tests of analogs he was conducting (T 1359–1363). There is no evidence in the record that Dr. Cooke told Fritz to run this test immediately, or how to formulate it. GAF has not pointed to anything in the record which suggests that Fritz or Dr. Cooke viewed the dichloride test with the heightened significance that GAF ascribes to it. Indeed, Dr. Cooke does not even recollect why Fritz ran the test (Finding 68). Second, if Dr. Cooke had wanted to test the dichloride to test a Randall "conception" there is no discernable reason why he would not have told Fritz that that was the reason for the test, or simply have run the test himself.

I am convinced that Fritz retested the dichloride because he thought it was an analog. I am not persuaded from the evidence that he made the retest in order to prove or disprove the Randall conception. In short I do not regard the retest as corroborating in any way GAF's claim that Dr. Randall had a conception.

d. *Summary*

■ I conclude that GAF has not proven by a preponderance of the evidence that Dr. Randall, in February-March 1966, conceived that the acid was an active plant growth regulator. There is little, if any, corroboration in this record for Dr. Randall's claim. His notebooks, the main documentary proof offered by GAF, do not corroborate a conception, and Dr. Randall's lack of contemporaneous assertions and his actions over the

course of the following years contradict his claim of conception and make his testimony unbelievable. In my view, Amchem's actions afford no evidence of Dr. Randall's alleged conception. The tangled web of circumstantial proof proffered by GAF in support of its position falls far short of meeting its burden, by even a preponderance of the evidence, that Dr. Randall conceived the plant growth regulating use of the acid in February 1966. Accordingly, GAF has failed to establish that Dr. Randall invented the plant growth regulating use of the acid.

Further, the weight of credible evidence satisfies me that the invention was made solely by employees of Amchem. Prior to the January 4 meeting, the ester had been found to control apical dominance. Dr. Cooke, on the basis of his observation of the cotton plants treated with the acid and ester, questioned the lack of activity of the acid on plants. He believed that, theoretically, the acid should have been as active as the ester (Finding 45). GAF disputes that Dr. Cooke ever questioned the activity of the acid or even observed the acid. Its position is based, in part, on the fact that neither Dr. Cooke nor Fritz recorded their observations of the acid's lack of activity. This circumstance does not outweigh Dr. Cooke's and Fritz' testimony given under vigorous cross-examination, that they, indeed, had made the observations in question. Further, Fritz gave a credible explanation of his failure to record. He pointed out that the observations of the acid were informal and not part of the scheduled defoliation test and since there was no deviation from expected response, he felt it unnecessary to make any notes. He further explained that the only reason he recorded his observation of the ester was because it was unexpected (T 1381). When Dr. Cooke was asked to speculate as to why Fritz did not record the acid observation, he gave the same reason that Fritz gave (T 1186). GAF has simply failed to persuade me that Fritz and Cooke were not telling the truth and I find that they did observe the cotton plants treated with the acid.

I am also satisfied that Dr. Cooke did indicate to Fritz that he was puzzled by the acid's lack of activity. First, Fritz corroborated Dr. Cooke's testimony, and second, Dr. Cooke, as borne out by his 1950 Master's thesis, had the scientific capability to engage in speculation regarding the activity of the acid vis-a-vis the ester (Finding 45). Third, I have found that Dr. Cooke did discuss the issue of the acid's activity at the January 4 meeting and at subsequent meetings with GAF personnel. (See Findings 51, 62, supra). Although GAF has set forth other items of circumstantial evidence suggesting that Dr. Cooke at no time questioned the lack of activity of the acid, those items do not outweigh Dr. Cooke's and Fritz' direct testimony, corroborated by the behavior of the Amchem screening group both prior and subsequent to the January 4 meeting, that the acid's lack of activity was questioned in December of 1965.

At the January 4 meeting, it is undisputed that Dr. Cooke asked that GAF supply Amchem with analogs of the ester. Further, I have found that Dr. Cooke did discuss the acid's lack of activity and the possibility that the acid may have been impure (Finding 45). Thus, at the January 4 meeting, Dr. Cooke conveyed to GAF a plan to test all substances related to the ester for activity including the acid. The record indicates that GAF viewed the acid as an analog of the ester (Finding 102). Dr. Cooke repeated his request for analogs of the ester again on February 4, March 1, and March 4, 1966, because he was not certain that the ester was the most active compound. On March 4 he again questioned the purity of the original acid in relation to these concerns (Finding 62).

These facts establish that Dr. Cooke, based on input from the primary screening results noticed by Evans and the work done by Fritz had, by the January 4 meeting, formulated a research plan to test anything related to the ester, including the acid, for activity. He speculated that the ester was not the most active component and desired to find out what was and questioned the role of the acid in that puzzle. This program and Dr. Cooke's concerns were com-

municated to GAF employees at various times during January-March 1966.

In *Lazo v. Tso*, 480 F.2d 908, 911 (CCPA 1973), the Court of Customs and Patent Appeals upheld a finding of conception on behalf of Tso in a case similar to this one. In *Lazo*, Tso was issued a patent for the use of a certain alcohol for inhibiting the growth of suckers in tobacco plants. The junior party, Lazo, claimed that he had read of Tso's work concerning the use of fatty acids and esters for the use of inhibiting tobacco suckers and had conceived that the alcohol would also be effective. The Court of Customs and Patent Appeals rejected the claim, holding that Tso had formulated a research program which included the alcohol and thus had a conception of the alcohol's use. It based its holding on the fact that Tso had written a research plan which included "saturated and unsaturated long chain aliphatic compounds, including primary, secondary and tertiary alcohols, related ketones, acids and esters." It viewed as corroboration the fact that Tso wrote a report indicating that a particular company was willing to supply him with "derivatives of C–9 fatty acids including alcohol, aldehydes, [and] ethyl esters . . . for . . . evaluation in greenhouses as well as in the field."

In the instant case the evidence establishes that once Amchem employees knew that the ester was active they formulated a plan to test all the compounds related to the ester. GAF's own documents establish that they viewed the acid as a related compound (Finding 102). GAF personnel knew that they were to supply a good sample of the acid (Findings 45, 62). This is sufficient to establish Amchem's employee's conception of the invention. *Lazo v. Tso, supra*, 480 F.2d 911.[16]

16. GAF has attempted throughout this trial to shift the burden on to Amchem to prove that it invented the use of the acid prior to February of 1966. Although I am convinced that this is indeed what occurred, it is not the only manner in which Amchem employees could have invented use of the acid.

Even assuming that no invention was made by Amchem prior to February 1966, GAF still has failed to prove that Dr. Randall had a conception. Although the doctrine of simultaneous conception and reduction to practice

## C. The Significance of the Identification of the Ethylene Response

GAF also claims that Dr. Randall's identification of the ethylene response was an essential part of the invention of the plant growth regulating use of the acid and accordingly Amchem's alleged misappropriation of that contribution entitles GAF to relief.

The method of applying the acid to plants to achieve plant growth regulation was well established before it was realized that the acid released ethylene. For example, by the summer of 1966 the following plant growth responses were known to be generated by the ester and, therefore, the acid: (1) defoliation, (2) increased tillering of small grains, (3) auxin activity, (4) the inducement of rooting, (5) control of apical dominance, (6) increased branching, (7) increased protein, (8) the retardation of terminal growth on a number of species, (9) increased flowering and fruiting, (10) prevention of lodging on a number of species, (11) the germination and stimulation of plants and (12) hormone effects (TX 292).

The fact that so many of the claimed uses of the acid were discovered prior to the discovery of the ethylene response makes it abundantly clear that knowledge that the acid released ethylene was not necessary to the practice of the basic invention, which was the application of the acid to regulate the growth of plants. *See Standard Coil Products Company, Inc. v. General Electric Company*, 306 F.2d 319, 323 (2d Cir. 1962).

Dr. Randall's discovery that the acid released the hormone ethylene finally explained the activity caused by the acid. Dr.

does not apply when the issue is originality or derivation, *see MacMillan v. Moffett, supra*, 432 F.2d at 1240, the determination that Dr. Randall did not have a conception takes the issue of originality of conception out of the case. Accordingly, it is also possible for Amchem to prove that its employees discovered the plant growth regulating use of the acid after it was delivered by Dr. Randall under the notion that such an invention was conceived when reduced to practice in March. *See Smith v. Bousquet*, 111 F.2d 157 (CCPA 1940).

Randall, himself, described his work as an explanation of the previously perceived activity (Finding 78) and Tone concluded the same after a long discussion with Randall (Finding 106).

█ The explanation of why the acid worked was not an essential prerequisite for Amchem to obtain patent protection for the acid. It is not necessary that inventors understand the scientific principle underlying their inventions. *See, e. g., Smith v. Hall*, 301 U.S. 216, 57 S.Ct. 711, 81 L.Ed. 1049 (1937); *Standard Coil Products Company, Inc. v. General Electric Company*, 306 F.2d 319, 323 (2d Cir. 1962); *Crozier-Straub v. Graham*, 28 F.2d 321, 322 (3d Cir. 1928). "Conversely [Dr. Randall's] later explanation of a previous invention is not sufficient to obtain a patent. The theory or principle of operation of a device is not patentable." *Chemical Construction Corporation v. Jones & Laughlin Steel Corporation*, 197 F.Supp. 644, 649 (W.D.Pa.1961), aff'd, 311 F.2d 367 (3d Cir. 1962).

█ It is true that the identification of the ethylene response led to the discovery of new uses for the acid, but this does not equate to invention. It is not invention to perceive that the method which others have discovered had qualities they failed to detect. *Chemical Construction Corporation v. Jones & Laughlin Steel Corporation, supra*, 197 F.Supp. at 649. As the court stated in *Ansul Company v. Uniroyal, Inc.*, 448 F.2d 872 (2d Cir. 1971), *cert. denied*, 404 U.S. 1018, 92 S.Ct. 680, 30 L.Ed.2d 666 (1972), "an inventor who discovers a basic new use is not required specifically to disclose or even be aware of all the uses of his invention." *Id.*, quoting, *The Ansul Corporation v. Uniroyal, Inc.*, 301 F.Supp. 273, 290–291 (S.D.N.Y.1969).

17. Because of my determination that knowledge of the ethylene response theory was not essential for the invention of the plant growth regulating use of the acid but merely explained a previously made invention, I need not reach the question of whether Dr. Randall's identification of the ethylene response would be entitled to a patent under 35 U.S.C. § 103, which prohibits the issuance of a patent to inventions which are obvious in light of the prior art.

In any event, GAF overestimates the significance of the post November research. Amchem was aware of a significant number of responses associated with ethylene prior to the Randall identification. At least 12 out of the 15 enumerated responses in Amchem's '188 patent, which GAF contends misappropriates the Randall ethylene discovery, were observed by the summer of 1966 (Finding 73). The discovery of the ethylene response simply was not the gist of. the invention. *See Howell & King v. Taborsky*, 164 U.S.P.Q. 58 (Bd. of Patent Interferences 1969).

GAF has failed to persuade me by a preponderance of the evidence that the identification of the ethylene response by Dr. Randall was an inventive contribution to the invention of the acid as a plant growth regulator, and since Dr. Randall's February 7 work did not constitute conception, GAF has not met its burden of proving that Dr. Randall was the inventor of the plant growth regulating use of the acid.[17]

### D. *Joint Inventorship*

GAF alternatively contends that, if Dr. Randall is not the sole inventor of the plant growth regulating use of the acid, he is a joint inventor.

The concept of joint inventorship has been described as "one of the muddiest concepts in the muddy metaphysics of the patent law." *Mueller Brass Company v. Reading Industries, Inc.*, 352 F.Supp. 1357 (E.D.Pa.1972). The Third Circuit has stated that, ". . . joint inventions are made when two or more persons jointly work or collaborate in devising and putting into practical form the subject matter of the patent in question." *Altoona Publix Theatres v. American Tri-Ergon Corp.*, 72 F.2d 53, 56 (3d Cir.), *rev'd on other grounds*, 294 U.S. 477, 55 S.Ct. 455, 79 L.Ed. 1005 (1934).

Suffice it to say, however, that in light of the Maynard and Swan article, the established uses of the acid prior to November, 1966, and Dr. Randall's statements in his April, 1967, senior scientist report (Findings 73, 77), I have significant doubts as to whether GAF has established that Dr. Randall's identification of the ethylene response was not obvious in light of the prior art.

More helpful are the principles for joint inventorship set forth in *Delaski & Thropp Circular Woven Tire Company v. William R. Thropp & Sons*, 218 F. 458, 464 (D.N.J.1914), *aff'd*, 226 F. 941 (3d Cir. 1915) (citations omitted).

> In order to constitute two persons joint inventors, it is not necessary that exactly the same idea should have occurred to each at the same time, and that they should work out together the embodiment of that idea in a perfected machine. The conception of the entire device may be due to one, but if the other makes suggestions of practical value, which assisted in working out the main idea and making it operative, or contributes an independent part of the entire invention, which is united with the parts produced by the other and creates the whole, he is a joint inventor, even though his contribution be of comparatively minor importance and merely the application of an old idea. . . .

> If the conception or contribution of one covers a distinct and independent part of the patented device, and is not an element which contributes to the operativeness of the completed device, or is not included in the claims covering a combination of elements, or is the subject of a separate claim in the same patent, such person is not a joint inventor.

■ Dr. Randall's claim to joint inventorship rests on the same two claims which I have already discussed at length. Dr. Randall's explanation of the invention through the discovery of the ethylene response is not a contribution which entitles him to be accorded the status of a joint inventor of the plant growth regulating use of the acid. The invention was already made and his work simply did not "contribute to the operativeness of the completed device." *Id.* See also Chisum, Patents, § 2.02[5] at 2–14 (1980).

Similarly Dr. Randall's February and March work does not entitle him to the status of joint inventorship. His submission of the pure acid sample was simply the correction of an error and was not related, in any way, to any conception that the acid would be an effective plant growth regulator. In essence, his contribution was identical to that of a person who pulled a chemical from a shelf for testing with no idea of its utility. No case can be found which accords the status of joint inventorship to one whose sole contribution is the non-conceptual submission of a chemical for testing. Plaintiff's counsel, in his closing argument, conceded that submission of a chemical without predictability of activity is not invention (T. 1621). I am not persuaded on the facts adduced at trial that Dr. Randall had made the requisite prediction of activity to entitle him to be a joint inventor of the plant growth regulating use of the acid.

### E. *Misappropriation and Derivation*

Assuming arguendo that Dr. Randall's February 1966 work was a conception of the plant growth regulating use of the acid, GAF would still not be entitled to the equitable relief it seeks in the 1972 action and in part of the 1975 action. GAF's claim is that Amchem misappropriated Randall's invention in breach of a confidential relationship which existed between the parties.[18] In order to succeed on such a claim it is incumbent upon GAF to prove that Dr. Randall communicated his conception to Amchem. *See, e. g., College Watercolor Group, Inc. v. William H. Newbauer, Inc.*, 468 Pa. 103, 360 A.2d 200, 204 (1976); *Van Products Company v. General Welding and Fabricating Company*, 419 Pa. 248, 259, 213 A.2d 769 (1965); *Smith v. Dravo*, 203 F.2d 369, 373 (7th Cir. 1953) (applying Pennsylvania law), Restatement, Torts, § 757(b) (1939). Clearly if Amchem did not know of Dr. Randall's contribution it could not have committed the misappropriation which is the essence of

---

18. GAF's claim is actually for misappropriation of a trade secret. *See generally Van Products Company v. General Welding and Fabricating Company*, 419 Pa. 248, 213 A.2d 769. Throughout the case GAF has contended that the trade secret which was misappropriated was Dr.

Randall's alleged inventions. It should be noted, however, that I have found that Dr. Randall's contribution was the non-conceptual submission of a chemical and that he never communicated a trade secret to Amchem.

the cause of action. *See College Watercolor Group, Inc. v. William H. Newbauer, Inc., supra*, 360 A.2d at 204–205, *Smith v. Dravo*, 203 F.2d at 373. *See* Dunlavey, Protection of the Inventor Outside the Patent System, 43 Cal.L.Rev. 457, 462 (1956) ("It is the employment of improper means [including breach of confidential relationship] to procure the invention, rather than its duplication per se against which the common law protects the inventor").[19]

Proof of communication is also required under the patent laws if GAF is to establish that Amchem derived its patent protection from Dr. Randall's invention.[20] *See, e. g., MacMillan v. Moffett, supra*, 432 F.2d at 1239; *DeGroff v. Roth*, 412 F.2d 1401, 1405 (CCPA 1969); *Polye v. Uhl*, 328 F.2d 893, 898 (CCPA 1964); *Johnson & Johnson v. W. L. Gore & Associates, Inc.*, 436 F.Supp. 704, 711 (D.Del.1977).

Again assuming that Dr. Randall had a conception in February 1966, I am convinced that Dr. Randall did not communicate that fact to anyone at Amchem. The discovery by Amchem personnel after Dr. Randall delivered the acid that the acid was active, was, therefore, not in any way dependent on information communicated by Dr. Randall. GAF, accordingly, has not established that Amchem misappropriated Dr. Randall's conception of the acid's activity, again assuming he made it. The fact that GAF informed Amchem of Dr. Randall's identification of the ethylene response in November of 1966 cannot serve to establish the misappropriation essential to GAF's claim. As indicated, the invention was

made well before that date and was not dependent on knowledge of that fact.

### F. *Conclusion*

On this initial phase of the trial, I conclude that Dr. Randall was neither the sole, nor a joint, inventor of the use of 2–chloroethylphosphonic acid as a plant growth regulator. Dr. Randall's contributions consisted simply of the correction of an error and an explanation of the invention. Further, even assuming that Dr. Randall conceived the plant growth regulating use of the acid, GAF has not established that Amchem misappropriated that conception.

Because of my determination of the above issues, it is unnecessary to discuss whether GAF's five-year delay in initiating this action bars this suit through application of the equitable doctrines of laches and estoppel.

### III. CONCLUSIONS OF LAW

1. This court has jurisdiction over the 1972 action pursuant to 28 U.S.C. § 1332.

2. This court has jurisdiction over the 1975 action pursuant to 28 U.S.C. §§ 1332 and 1338.

3. Pennsylvania law governs whether GAF is entitled to have Amchem declared a constructive trustee of the foreign and domestic patents and patent applications concerning the plant growth regulating use of 2–chloroethylphosphonic acid.

4. Whether Dr. David I. Randall was a sole or joint inventor of the plant growth regulating use of the acid is to be deter-

---

**19.** GAF has not alleged and there is nothing in this record to suggest that Amchem obtained knowledge of the alleged invention by improper means. *See College Watercolor Group, Inc. v. William H. Newbauer, Inc., supra*, 360 A.2d at 204, quoting, Restatement, Torts § 757(a).

**20.** There is dicta in some cases to the effect that one can establish derivation other than through the communication of a complete conception. *See, e. g., MacMillan v. Moffett, supra*, 432 F.2d at 1239; *Hedgewick v. Akers*, 497 F.2d 905, 908 n.4 (CCPA 1974). Neither of these cases, however, discusses how to establish derivation in the absence of communication of a complete conception. The *Hedgewick* court cited the case of *Alexander v. Williams*,

342 F.2d 466 (CCPA 1965) as support for its proposition that "showing a prior complete conception and communication thereof is not the only way to establish derivation." 497 F.2d at 908 n.4. In *Alexander* the court found that there was derivation even though the party claiming did not have a complete conception. There was, however, a communication of part of the invention. 342 F.2d at 470–71. *See* Chisum, Patents, § 10.04[5] at 10–58 (1980). No case can be found which sustains a claim of derivation without communication. In the instant case, Dr. Randall simply did not communicate any idea, all he did was to correct an error.

mined by reference to the United States Patent Laws. 35 U.S.C. § 1 *et seq.*

5. Dr. David I. Randall did not have a conception of the plant growth regulating use of the acid in February of 1966 and accordingly was not the inventor of that use.

6. Dr. Randall's identification of the ethylene response explained why the acid effectively regulated plant growth and was not an invention.

a. Knowledge of this fact was not essential to practice the invention of applying the acid to achieve plant growth regulation.

7. Dr. Randall was not a co-inventor of the plant growth regulating use of the acid.

8. Dr. Randall did not communicate to Amchem whatever thoughts or conceptions he might have had concerning the plant growth regulating use of the acid, accordingly Amchem could not have misappropriated any conception or invention of Dr. Randall.

9. GAF has not established either that Dr. Randall invented the plant growth regulating use of 2–chloroethylphosphonic acid or that Amchem misappropriated such invention. Accordingly, GAF is not entitled to have Amchem declared a constructive trustee of the foreign patents and patent applications embodying the plant growth regulating use of 2–chloroethylphosphonic acid, nor is it entitled to any other equitable relief relating to the invention.

Counsel for the prevailing party, Amchem, may submit proposed forms of Orders to be entered in each of the above-captioned actions upon ten (10) days' notice to opposing counsel.